SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**State v. James P. Kucinski** (A-58-15) (076798)

**Argued October 26, 2016 -- Decided January 30, 2017**

**Solomon, J., writing for a unanimous Court.**

In this appeal, the Court considers whether cross-examination regarding facts to which defendant testified at trial, but omitted in his statement to police, was proper.

Defendant was arrested and taken to police headquarters for questioning about the bludgeoning death of his brother, John. Defendant was advised of his Miranda rights and he requested an attorney. The officers stopped the interrogation and met with their supervisor. After approximately eighty minutes they returned to the interview room and advised defendant that he was going to be charged with murder. Defendant then asked if he could speak with the officers, stating "I'm gonna tell you the truth." He was re-read his Miranda rights, which he waived.

Defendant explained that a few weeks earlier a fight had occurred between him and his brother. When the officers attempted to redirect the discussion to "how it started today" -- the day of John's death -- defendant responded, "Ah, well let's not talk about that part." He then shifted the dialogue to other topics. In response to inquiries about how John injured defendant, he stated, "Like I said, we'll forget about that part." Defendant responded to a series of questions about events leading up to the fight and the injuries he sustained. As the interrogation went on, defendant continued to turn to other topics and to evade answering questions directly. Several times throughout the interrogation defendant answered questions with "I don't know." When asked how defendant felt about John's death, he said he would "rather [] just see a lawyer," and the interrogation ended.

Before trial, defendant moved to suppress his statement to police and argued that the officers did not honor his invocation of the right to counsel. The court denied defendant's suppression motion, and the case proceeded to trial. At trial, the prosecutor asked one of the officers if defendant spoke in detail about the events on the day John died and if defendant was given an opportunity to "explain what happened that day." When defense counsel objected, the trial judge sustained the objection but held that if defendant testified, the prosecutor would be permitted to cross-examine him on inconsistencies between his trial testimony and statements to police.

Defendant elected to testify at trial and claimed to have acted in self-defense. On cross-examination, over defense counsel's objection, the prosecutor was permitted to question defendant about details defendant had testified to in his direct examination that contradicted what he said in his post-arrest statement to police. The prosecutor focused on details that defendant testified to but failed to mention to police during his interrogation. After further questioning by the prosecutor, defense counsel moved for a mistrial. The trial court denied the motion but instructed the jury that defendant's right to remain silent should be limited to assessing defendant's credibility and may not be used to make the determination of guilt. Defense counsel did not object.

When the trial resumed, defense counsel informed the court that the limiting instruction advised the jury that defendant's silence could be used for impeachment purposes. Counsel requested a clarifying instruction to fix this error, which the trial court issued. This instruction was repeated, without objection, during the final jury charge. The jury found defendant guilty of passion/provocation manslaughter, as well as third-degree possession of a weapon for an unlawful purpose.

The Appellate Division reversed defendant's conviction and remanded for a new trial, determining that the prosecutor's questions on cross-examination were improper. The panel found that defendant invoked his right to remain silent by telling the police that he did not want to talk about certain subjects and answer certain questions. The panel reasoned that, accordingly, the statements could not be used for any purpose, including impeachment. Further, the Appellate Division found the trial court's instructions to the jury were fatally flawed.

1

The Court granted the State's petition for certification. 224 N.J. 282 (2016).

**HELD**: Defendant waived his right to remain silent and therefore the State permissibly questioned defendant on cross-examination about the inconsistencies between his post-arrest statement to police and his statement on direct-examination at trial.

1. The United States Supreme Court first considered whether a defendant's pretrial silence could be used to impeach his credibility on cross-examination at trial in United States v. Hale, 422 U.S. 171, 95 S. Ct. 2133, 45 L. Ed. 2d 99 (1975). A year later, this Court considered a similar question in State v. Deatore, 70 N.J. 100, 108-09 (1976), and held that a defendant who remains silent "at or near the time of his arrest" cannot be cross-examined about that silence if he subsequently testifies to an exculpatory version of events at trial. In State v. Lyle, 73 N.J. 403 (1977), this Court again incorporated U.S. Supreme Court authority and concluded that "the State's use of a defendant's post-arrest silence for purposes of impeaching his exculpatory defense violates due process" and is "improper irrespective of whether [Miranda] warnings are given." Id. at 409-10 (citation omitted). The Court applied the general principles of Lyle and Deatore in State v. Muhammad, 182 N.J. 551, 568 (2005), where the Court explained that "by speaking with the police, a suspect does not waive his right to invoke the privilege and remain silent at some later point." (pp. 20-23)

2. With respect to cross-examination of a defendant on factual inconsistencies between his testimony at trial and his pretrial statement, the Court has held that "it is not an infringement of a defendant's right to remain silent for the State to point out differences in the defendant's testimony at trial and his or her statements that were freely given." State v. Tucker, 190 N.J. 183, 189 (2007). (pp. 24-26)

3. When a defendant invokes his or her right to remain silent, the interrogation must cease, at least until some time has lapsed and the defendant is reread his Miranda rights. That being said, even if a defendant is successful in invoking his or her right to remain silent about a particular subject, this right is waived if the defendant discusses, of his or her own volition, that very topic just moments later. (p. 27)

4. In the present case, defendant waived his right to remain silent. Defendant was cognizant of his Miranda rights and clearly and unambiguously invoked his right to counsel when police originally administered Miranda warnings. However, after first invoking his right to counsel, it was defendant who asked to speak with officers so that he could "tell [them] the truth." After acknowledging that he had fought with his brother, defendant avoided questions by saying "[a]h, let's not talk about that part," "we'll forget about that part," "it doesn't matter," and "I don't remember." Considered in context, defendant's refusal to answer certain questions was not an attempt to end the dialogue, but rather was "part of an ongoing stream of speech," which included information about the altercation and defendant's family disputes. Most importantly, defendant voluntarily provided details about the altercation that led to John's death—the very subject about which he previously said, "let's not talk about that part." In other words, defendant told investigators about his recollection of the altercation with John—he thus spoke on that subject. (pp. 27-29)

5. Because defendant waived his right to remain silent, cross-examination regarding facts to which he testified at trial, but omitted in his statement to police, was proper. During interrogation, defendant claimed his injuries were caused by John biting him. Defendant's story changed during his testimony when he claimed John stabbed him with a screwdriver and he was forced to defend himself. Therefore, the State's cross-examination sought to highlight the inconsistency between defendant's statement to police during interrogation and his testimony on direct examination. This inconsistency is a permissible area for cross-examination. (pp. 29-30)

6. Because defendant did not invoke his right to remain silent, any error in the trial court's instruction to the jury, to which defendant did not object, was harmless. (pp. 30-31)

The judgment of the Appellate Division is **REVERSED** and defendant's conviction is **REINSTATED**.

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and TIMPONE join in JUSTICE SOLOMON's opinion.**

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

       v.

JAMES P. KUCINSKI,

    Defendant-Respondent.


Argued October 26, 2016 – Decided January 30, 2017

On certification to the Superior Court, Appellate Division.

Nancy A. Hulett, Assistant Prosecutor, argued the cause for appellant (Andrew C. Carey, Middlesex County Prosecutor, attorney).

Rochelle M.A. Watson, Assistant Deputy Public Defender, argued the cause for respondent (Joseph E. Krakora, Public Defender, attorney).

Sarah E. Ross, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Christopher S. Porrino, Attorney General, attorney).

JUSTICE SOLOMON delivered the opinion of the Court.

We are called upon to determine whether a defendant invoked his right to remain silent after originally waiving his Miranda[1] rights.  If so, we must also decide whether the State wrongly

_____

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

1

cross-examined defendant by highlighting missing details in his post-arrest statement and whether the trial court's curative instructions were flawed and warrant reversal of defendant's conviction.

Defendant was brought to the police station for questioning about the bludgeoning death of his brother, John. After receiving Miranda warnings, defendant refused to speak with police officers and was left alone for approximately eighty minutes. When the officers returned and told defendant that he was going to be charged with John's murder, defendant asked to speak to the officers. He was re-read the Miranda warnings and waived his Miranda rights. Questioning ensued.

During defendant's interrogation, he refused to answer certain questions about his altercation with John. Instead, he pivoted the conversation to other topics. Eventually, however, defendant discussed details about the confrontation with, and death of, his brother. When asked how defendant felt about John's death, he said he would "rather [] just see a lawyer," and the interrogation ended.

Defendant was indicted for John's murder and unsuccessfully moved to suppress his statement to police. The matter proceeded to trial, and defendant testified on his own behalf. Over defense counsel's objection, the prosecutor was permitted to cross-examine defendant about details of the incident he

2

testified to in his direct examination but omitted from his post-arrest statement to police.

The jury convicted defendant of passion/provocation manslaughter, N.J.S.A. 2C:11-4(b)(2), and third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d). The Appellate Division reversed defendant's conviction and remanded for a new trial. The panel found that the prosecutor's cross-examination of defendant was improper and violated defendant's right against self-incrimination. Further, the panel held that the instructions given to the jury were fatally flawed. We granted the State's petition for certification.

We hold that defendant waived his right to remain silent by voluntarily discussing details of his altercation with John, just moments after telling the officers that he did not wish to comment on that particular subject. Because defendant did not assert his right to silence, the State permissibly questioned defendant on cross-examination about the inconsistencies between his statement during interrogation and his statement on direct-examination. In light of this holding, we find any error in the trial court's instructions to be harmless. Therefore, we reverse the judgment of the Appellate Division and reinstate defendant's conviction.

I.

3

A.

The pertinent facts of record follow. Defendant's brother, John, lived in Edison with their eighty-one-year-old mother, Anna, and served as her caretaker. Defendant lived with his long-term girlfriend about a quarter mile away. Defendant and John had a strained relationship with a history of violent, physical altercations. According to their oldest brother, Steven, defendant's drinking was the root of most of their conflicts. As a result, a family friend, Ralph Hopping, acted as a liaison between John and defendant and was defendant's only source of information about his mother's deteriorating health.

The day before John's death, defendant called Hopping because he was angry that he could not speak directly to his mother and wanted an update on her condition. He told Hopping, "You better get your suit ready. I have two brothers that belong in the cemetery."

The next day, according to defendant's girlfriend, John spoke to defendant over the phone and threatened to kill defendant if he came to the house to see their mother. After the telephone conversation ended, defendant told his girlfriend that he was going to see his mother and left the house. Defendant returned home thirty minutes later with blood on his

4

arms, face, neck, and clothing.  When his girlfriend asked about the blood, defendant told her, "I just did John."

Meanwhile, one of Anna's neighbors arrived home and saw John lying in the driveway.  Police arrived shortly thereafter and observed John lying face-down in the driveway, with blood splatter, a leaf blower, and pieces of brick near his body.  John was pronounced dead at the scene by emergency medical personnel.

Later that day, officers located defendant sitting inside his vehicle in a restaurant parking lot near his home.  As the officers approached, they observed abrasions on defendant's hands and head and blood "spots" on his shirt.  The officers ordered defendant out of his vehicle and noticed blood on his boots as well.

Defendant was arrested and taken to police headquarters, where he was met by Investigator George Trillhaase and Detective Tom Duffy for questioning.  Defendant was advised of his Miranda rights and he requested an attorney.  Investigator Trillhaase and Detective Duffy stopped the interrogation and met with their supervisor.  The decision was made to charge defendant with John's murder.

After approximately eighty minutes, Investigator Trillhaase and Detective Duffy re-entered the interview room and advised defendant that he was going to be charged with murder.

Defendant then asked if he could speak with the investigators, stating "I'm gonna tell you the truth."  Defendant was re-read his <u>Miranda</u> rights, which he waived both orally and in writing.

Defendant began the conversation by explaining that a few weeks earlier a fight had occurred involving him, John, and Steven during a visit to the hospital where their mother was being treated at the time.  When the interrogators attempted to redirect the discussion to "how it started today" -- the day of John's death -- defendant responded, "Ah, well let's not talk about that part."  He then shifted the dialogue to weapons he believed John kept at Anna's house.  In response to inquiries about how John injured defendant, he stated, "Like I said, we'll forget about that part.  He's not a good person[,] believe me."  Defendant then, once again, turned to the weapons in Anna's house:

> [Inv. Trillhaase]:  Tell us why, tell us why you're concerned about the loaded guns [at Anna's house].
>
> [Defendant]:  Because he keeps telling me he's gonna kill me.
>
> [Inv. Trillhaase]:  Ok.
>
> [Defendant]:  He's gonna kill me.
>
> [Inv. Trillhaase]:  What happened today about the loaded gun or did that come in play at all?
>
> [Defendant]:  That came in play a long time ago.

6

. . . .

[Q][2]:  I believe he asked you if there was [a] gun involved today?

[Defendant]:  Yes.

[Q]:  How was a gun involved today?

[Defendant]:  That's, well he keeps . . .

[Q]:  Did he threaten you with a gun?

[Defendant]:  . . . telling me.  He keeps telling me he's gonna kill me.

[Q]:  Ok, did he tell you that today?

[Defendant]:  Yes, he did.

Defendant then responded to a series of questions about events leading up to the fight and the injuries he sustained:

[Q]:  Can you tell us how you got injured?

[Defendant]:  Who knows?  Him biting me.  He was biting me.  Yeah we had a confrontation but he was biting me.  See?

[Det. Duffy]:  I see, you got there, you got cuts on your hand.  You got cut on your arm . . .

[Defendant]:  Yeah, well . . .

[Det. Duffy]:  . . . hand's all swollen.

[Defendant]:  . . . biting me here.  He's a c**t.

---

[2] "[Q]" indicates a question from one of the two interrogators where the transcript does not specify whether Investigator Trillhaase or Detective Duffy is the one asking the question.

[Q]: Was anything used, other than your hands and your fists?

[Defendant]: No, no.

As the interrogation went on, defendant continued to turn to other topics and to evade answering questions directly.

[Det. Duffy]: You said you kicked him on the way down or whatever, what, what, what other types of blows were thrown? I mean, we see obvious injuries, we're trying to ask and trying to find out how did this occur?

[Defendant]: I defended myself.

[Det. Duffy]: That's what we've been asking you.

[Defendant]: Ok.

[Det. Duffy]: What did he, what did he do that you had to defend yourself?

[Defendant]: It don't it don't matter.

[Det. Duffy]: It does matter.

[Defendant]: It doesn't matter. Hey, I'm sorry he's gone.

Several times throughout the interrogation defendant answered questions with "I don't know." For example:

[Det. Duffy]: We do believe you. Already told you that. That's not even a question that I don't, I understand that he threatened you before, you said he threatened you today, what happened today? We know you had a confrontation, he bit you, you have wounds on, on your hands, you said you kicked him in the head, we know that. But there's the questions of cutting, a question of a knife.

[Defendant]: No knife.

[Det. Duffy]:  What about the brick?  The brick could have cut him?

[Defendant]:  I don't know.  Honestly.

[Det. Duffy]:  What do you mean, you don't know, you don't know?  You don't know.  What was up with the brick?  Did he attack you with the brick?  That's what I'm asking.

[Defendant]:  I really can't talk about stuff like that.

Near the end of questioning, the topic turned to defendant's feelings about his brother's death.  He was asked to "just walk through it" and "do your brother right."  Defendant responded, "I'd rather uh just see a lawyer.  That's all.  Ok, thanks."  The interview concluded with defendant saying, "Put me down as a murderer.  I'm gonna go down."

Defendant was charged with first-degree murder, N.J.S.A. 2C:11-3(a)(1) or (2), and third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d).

B.

Before trial, defendant moved to suppress his statement to police and argued that the officers did not honor his invocation of the right to counsel.  At the suppression hearing, the motion court received testimony from Investigator Trillhaase and viewed the videotape of defendant's interview with Investigator Trillhaase and Detective Duffy.  The court denied defendant's suppression motion, and the case proceeded to trial.

9

During opening statements, the prosecutor explained to the jury:

> [Defendant] says that he had to defend himself, but when pressed he doesn't give details. He avoids them. He doesn't explain. The detectives are asking him, you'll see detectives are asking him to explain what happened that day, what happened on April 30? And he never says --

Defense counsel moved for a mistrial, contending that the State improperly commented on defendant's right to remain silent. The trial court denied the motion.

During Investigator Trillhaase's testimony at trial, the prosecutor asked him if defendant spoke in detail about the events on the day John died and if defendant was given an opportunity to "explain what happened that day." At sidebar, defense counsel objected, claiming that the State was, once again, impermissibly commenting on defendant's right to remain silent. The trial judge sustained the objection but held that if defendant testified, the prosecutor would be permitted to cross-examine him on inconsistencies between his trial testimony and statements to police.

Defendant elected to testify on his own behalf at trial and claimed to have acted in self-defense. Defendant stated that he and John had a volatile relationship because defendant was not kept informed about their mother's health. Defendant confirmed that he went to his mother's house on the day of John's death.

10

He said that he intended to visit their mother because she had just come home from a rehabilitation center. Defendant testified that he did not expect John to be at home, but when defendant arrived, John was in the driveway fixing a leaf blower. According to defendant, John asked where he was going, and defendant replied that he was going to see their mother. Defendant testified that John said, "No you're not," then pushed and hit defendant. By defendant's account, John bit defendant during their altercation and stabbed him with a screwdriver in his left arm. They then both grabbed bricks from a pile and swung them at each other.

Following defendant's direct testimony, the trial judge discussed with counsel the proper limits of cross-examination. The prosecutor argued that once a person waives his or her Miranda rights, any post-Miranda silence is subject to cross-examination or comment. The judge allowed the prosecutor to "use anything that [defendant] said [on direct] against him if [it] contradicts what he said in his statement" to police. The judge also instructed that "almost everything that [defendant] said as to what happened on that date is attackable" but that non-responsive answers to the police could not be raised. Although defendant's pretrial motion to suppress his statement to police had been denied, defense counsel responded that the "entire statement was essentially a very long invocation of the

11

right to remain silent" and that the State's proposed line of questioning was an "inferential comment on [defendant's] right to remain silent."

During defendant's cross-examination, the prosecutor focused on details that defendant testified to on direct examination but failed to mention to police during his post-arrest interrogation.[3]

> [STATE:]   Let me get this straight, sir. You're now saying that some kind of screwdriver was involved?
>
> [DEFENDANT:]  Yes.
>
> [STATE:]  Okay.  Ever mention a screwdriver at all in the statement that we saw yesterday?
>
> [DEFENDANT:]  No, I did not.
>
> [STATE:]  Ever?
>
> [DEFENDANT:]  No.
>
> [STATE:]   No.   Did the Detectives ask you multiple times if any weapons were used?
>
> . . . .
>
> [DEFENDANT:]   I didn't want to answer any questions that had to do with that.  What my brother did to me, what I did to him, I didn't want to talk about that.

---

[3]  In the interest of brevity, we do not include every portion of defendant's cross-examination relevant to the issue in this appeal.  Instead, the excerpts provided are representative of the dialogue between defendant and the prosecutor.

Despite an objection by defense counsel, the State continued to question defendant about missing details in his post-arrest statement.

> [STATE:] Did you tell the Detectives that you got stabbed with a screwdriver into your muscle?
>
> [DEFENDANT:] No. I didn't want to talk about that. They asked me about it. I didn't want to talk about it.
>
> [STATE:] So you defended yourself against this attack from John by a screwdriver and you don't want to tell the cops that?
>
> . . . .
>
> [STATE:] You're saying today, three-and-a-half years later, you don't want to tell the cops that you got stabbed by a screwdriver by John?
>
> [DEFENDANT:] I didn't want to talk about it. They asked me [what] other wounds I had on me and I just didn't want to talk about it.
>
> . . . .
>
> [STATE:] When they asked you, "Were any weapons used other than your hands and fists," you said what?
>
> . . . .
>
> [DEFENDANT:] I didn't want to talk about it. I didn't want to talk about what went on there, what he did and what I did.
>
> [STATE:] After being charged with murder, you didn't want to talk about it?

At sidebar, the court instructed the prosecutor to avoid questions about the information defendant did not disclose to police. The prosecutor then continued as follows:

> [STATE:] So back on April 30th, you tell the police "We just had an argument." Right?
>
> [DEFENDANT:] Uh-huh.
>
> [STATE:] Today you give all kinds of details . . . [a]bout what happened in the driveway.
>
> [DEFENDANT:] Once again, I didn't want to talk about it.
>
> [STATE:] After they charged you with murder, you didn't want to talk about it?
>
> [DEFENDANT:] I didn't want to talk about it.
>
> . . . .
>
> [STATE:] [During the interrogation] the Detectives asked you what happened when you got there, and you say, "I don't know." Right?
>
> [DEFENDANT:] Yes.
>
> [STATE:] Today you give us all kinds of detail of what happened when you got there. Right?
>
> [DEFENDANT:] I said I don't know. This way I wouldn't have to talk about it.

After further questioning by the prosecutor, defense counsel moved for a mistrial. The trial court denied the motion but gave the following instruction to the jury:

> A Defendant has a right to remain silent, and no inference of guilt should be drawn from his exercise of that right. It should be limited to assessing the Defendant's credibility and that invoking his right to

14

remain silent may not be used in determining whether he is guilty or not guilty.

So if he said something which was contradictory in one statement as opposed to the other, that determines -- you can use that relative to determine [sic] his credibility. But the fact that he exercises his right to remain silent relative to some questions, you can't make the determination of his guilt or innocence based on that. Okay?

Defense counsel did not object.

When the trial resumed five days later, defense counsel informed the court that the instructions previously given to the jury advised that defendant's silence could be used for impeachment purposes. To fix this error, defense counsel requested a limiting instruction. The trial court issued a clarifying instruction, stating that "a defendant has a right to remain silent and no inference of guilt should be drawn from his exercise of that right." This instruction was repeated, without objection, during the final jury charge.

The jury found defendant guilty of the lesser-included offense of passion/provocation manslaughter, N.J.S.A. 2C:11-4(b)(2), as well as third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d). The court merged the convictions and imposed a nine-year term of imprisonment subject to an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2, as well as appropriate fines and fees.

Defendant appealed, arguing that the prosecutor improperly cross-examined defendant on his failure to provide details of his self-defense claim during his post-arrest statement to police. The Appellate Division reversed defendant's conviction and remanded for a new trial, determining that the prosecutor's questions on cross-examination were improper and violated defendant's right against self-incrimination. The panel found that defendant invoked his right to remain silent by telling the police that he did not want to talk about certain subjects and answer certain questions. It reasoned that, accordingly, the statements could not be used for any purpose, including impeachment. Further, the Appellate Division found the trial court's instructions to the jury were fatally flawed because, "[i]n both instructions, the judge failed to advise the jurors that no inference of defendant's guilt or credibility should be drawn from the exercise of his right to remain silent."

This Court granted the State's petition for certification. State v. Kucinski, 224 N.J. 282 (2016). We also granted amicus curiae status to the Attorney General of New Jersey.

II.

The State contends that although it may not comment on a defendant's silence at or near the time of arrest, defendant here did not invoke his right to remain silent because he voluntarily waived his Miranda rights, both orally and in

16

writing, and proceeded to speak to the detectives.  Relying on this Court's decision in State v. Tucker, 190 N.J. 183 (2007), and holdings of the United States Supreme Court, the State claims that "[t]he outline of the relevant precedent shows that a defendant who speaks freely after waiving his Miranda rights can be cross-examined if he testifies at trial inconsistently with his prior statement."  Because defendant here was not silent, and because he signed a waiver of his right to remain silent, the State argues that defendant was "no longer cloaked with the protections afforded under Miranda."  Therefore, "[t]he detailed story defendant provided from the stand at trial was subject to attack on the ground that when defendant spoke to police a few hours after the murder, he had said hardly any of it."

Like the State, the Attorney General contends that "[t]his case is not about silence" but is about defendant's refusal to speak about certain subjects while freely speaking about others after he was read his Miranda rights and waived them.  According to the Attorney General, defendant's decision to select the degree of detail with which he would answer questions was not an assertion of the right to remain silent, and by offering more detail on the stand than during the interrogation, defendant presented two different versions of the event.

The Attorney General argues that, by telling the officer "I don't know" or "I don't want to talk about that" in response to precise questions, defendant gave a statement that was "vastly different" from his testimony on the stand, in which he provided very specific details about the events that took place leading up to John's death. If prosecutors are not permitted to question a defendant about omissions and inconsistencies between a post-Miranda statement and in-court testimony, the Attorney General asserts, "a defendant has the opportunity to manipulate his or her trial testimony with recently fabricated details based on gaps in his or her previous statements." The Attorney General also maintains that any limiting instruction issued to the jury about defendant's post-arrest statement was unnecessary.

Defendant asserts that "[a] reasonable interpretation of the Miranda warnings is that one has the right to say nothing at all, and should the right to speak be exercised, it does not carry with it the affirmative obligation to come forth with the complete and precise exculpatory version one intends to later rely on." Therefore, defendant's waiver did not "impose some affirmative obligation on him to speak, much less to speak on all matters of interest to the State and, therefore, he cannot be impugned for his failure to do so." Defendant argues that the right to remain silent is rendered "illusory" if the State

18

is permitted to cross-examine a defendant who first waives his Miranda rights and then later invokes his right to remain silent by refusing to respond to certain questions. Finally, defendant claims that he was permitted to, and did, invoke his right to remain silent as to particular questions.

## III.

We begin by noting that the Fifth Amendment of the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The federal protection against compelled self-incrimination must be "scrupulously honored." Michigan v. Mosley, 423 U.S. 96, 103-04, 96 S. Ct. 321, 326, 46 L. Ed. 2d 313, 321 (1975) (quoting Miranda, supra, 384 U.S. at 479, 86 S. Ct. at 1630, 16 L. Ed. 2d at 726); see also State v. Kennedy, 97 N.J. 278, 288 (1984).

Although New Jersey's privilege against self-incrimination is not enshrined in our State Constitution, "the privilege itself is firmly established as part of the common law of New Jersey and has been incorporated into our Rules of Evidence." State v. Hartley, 103 N.J. 252, 260 (1986) (quoting In re Martin, 90 N.J. 295, 331 (1982)); N.J.R.E. 501, 502, 503. Furthermore, "[o]ur state-law privilege against self-incrimination offers broader protection than its federal

19

counterpart under the Fifth Amendment." State v. Muhammad, 182 N.J. 551, 568 (2005).

A.

The United States Supreme Court first considered whether a defendant's pretrial silence could be used to impeach his credibility on cross-examination at trial in United States v. Hale, 422 U.S. 171, 95 S. Ct. 2133, 45 L. Ed. 2d 99 (1975). There, the defendant was placed under arrest, given Miranda warnings, and remained silent. Id. at 174, 95 S. Ct. at 2135, 45 L. Ed. 2d at 103. During his testimony at trial, however, the defendant provided a detailed alibi for his whereabouts during the commission of the crime at issue. Ibid. Relying on evidentiary rather than constitutional grounds, the Court found that the risk of unfair prejudice by admitting it into evidence outweighed the probative value of the defendant's pretrial silence, id. at 180, 95 S. Ct. at 2138, 45 L. Ed. 2d at 107, and that "his failure to offer an explanation during . . . custodial interrogation can as easily be taken to indicate reliance on the right to remain silent as to support an inference that the explanatory testimony was a later fabrication," id. at 177, 95 S. Ct. at 2137, 45 L. Ed. 2d at 105.

A year later, this Court considered a similar question in State v. Deatore and held that, "whether or not the defendant received his Miranda warnings," 70 N.J. 100, 117 n.10 (1976), a

20

defendant who remains silent "at or near the time of his arrest" cannot be cross-examined about that silence if he subsequently testifies to an exculpatory version of events at trial, id. at 108-09.

The United States Supreme Court reached a similar conclusion, this time on constitutional grounds, in Doyle v. Ohio, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). The Court concluded that "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." Id. at 618, 96 S. Ct. at 2245, 49 L. Ed. 2d at 98.

We incorporated Doyle's reasoning into our decision in State v. Lyle, 73 N.J. 403 (1977). In Lyle, supra, the victim was shot after he entered the defendant's store. 73 N.J. at 405. When investigating officers arrived at the scene asking for "Henry," the defendant responded, "Yes, I'm Henry. I shot him." Id. at 406. The officers then administered Miranda warnings, after which the defendant made no response. Ibid. At trial, the defendant testified that he acted in self-defense, stating that the victim tried to attack him with a screwdriver. Id. at 405, 408. The prosecutor pointed out, in his cross-examination of the defendant and in summation, that the defendant failed to mention a screwdriver to officers who first

21

responded to the scene. Id. at 408-09. Highlighting Doyle and Deatore, we made clear that "the State's use of a defendant's post-arrest silence for purposes of impeaching his exculpatory defense violates due process" and is "improper irrespective of whether [Miranda] warnings are given." Id. at 409-10 (citing Deatore, supra, 70 N.J. at 117 n.10).

This Court applied the general principles of Lyle and Deatore in our decision in Muhammad. In that case, a woman was walking home from her cousin's house through an area in Paterson known for prostitution. Muhammad, supra, 182 N.J. at 559. As she walked, the defendant approached the woman in a vehicle, identified himself as a Paterson police officer, stated that she was under arrest for prostitution, and ordered her into the back seat of his car. Ibid. At the time of the offense, the defendant was a fifteen-year veteran of the City of Passaic police force but had been terminated from that job a month earlier. Id. at 559 n.1. The defendant drove the victim to a dark, dead-end street and sexually assaulted her. Id. at 559. Thereafter, the woman insisted that she be driven to the local jail, and, upon their arrival at Paterson police headquarters, the defendant told the sergeant on duty that the victim was brought in because she had harassed the defendant's siblings. Id. at 560. The victim interrupted, accused the defendant of lying, told the sergeant she had been raped, and produced the

22

condom the defendant used as proof. Ibid. The defendant became visibly nervous and asked if he could go home. Id. at 561. He was detained at the police station, however, and eventually placed under arrest. Ibid.

At trial, defense counsel asserted that the victim was a prostitute and the sex was consensual. Id. at 562. In opening and closing arguments and during questioning of witnesses, the prosecutor "repeatedly referenced [the] defendant's failure to make any mention at police headquarters of a consensual encounter with [the victim] or that she was a prostitute." Ibid.

We held in Muhammad that the State's questioning violated the defendant's right against self-incrimination. Id. at 573-74. Explaining that it was of no consequence that the defendant initially presented the story of harassment to officers before falling silent, we said, "A suspect who begins to speak to the police while in custody, during interrogation, or 'at or near' the time of his arrest does not waive his right against self-incrimination when he falls silent." Id. at 568. "In other words, by speaking with the police, a suspect does not waive his right to invoke the privilege and remain silent at some later point." Ibid.

B.

23

Also germane to the issue before this Court is whether a defendant may be cross-examined on factual inconsistencies between his testimony at trial and his pretrial statement. Both federal and New Jersey jurisprudence establish guidelines for cross-examination of a defendant on such inconsistencies. In Anderson v. Charles, the United States Supreme Court found that the holding in Doyle -- that a prosecutor cannot cross-examine a defendant on his post-arrest silence after being given Miranda warnings -- "does not apply to cross-examination that merely inquires into prior inconsistent statements . . . because a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent." 447 U.S. 404, 408, 100 S. Ct. 2180, 2182, 65 L. Ed. 2d 222, 226 (1980). Importantly, the Court went on to explain that, while "two inconsistent descriptions of events may be said to involve 'silence' insofar as [one] omits facts included in the other version[,] . . . Doyle does not require any such formalistic understanding of 'silence,' and we find no reason to adopt such a view in this case." Id. at 409, 100 S. Ct. at 2182, 65 L. Ed. 2d at 227.

Following Anderson, this Court decided Tucker. There, the defendant, Tucker, called 9-1-1 and reported that he had returned home to discover his mother's dead body. Tucker, supra, 190 N.J. at 185. Upon questioning by the responding

24

officer, Tucker stated that he last saw his mother two days earlier when he drove her home from the grocery store, before leaving to spend the weekend with his girlfriend. Ibid. The police then transported Tucker to police headquarters and administered Miranda warnings. Ibid. Around that time, Tucker reiterated the story about how he last saw his mother when he brought her home from the grocery store. Id. at 186.

Subsequent investigation revealed that Tucker's mother made a check out to cash in the amount of $3000, and that she cashed a check at the local bank on the day that Tucker claimed to have brought her to the grocery store. Ibid. In a second interview with the police, Tucker was again read his Miranda rights. Ibid. Tucker then admitted that he took his mother to the bank, but stated that he waited for her in the car. Ibid. Surveillance tapes from the bank revealed that Tucker went inside the bank with his mother. Ibid.

At trial, the State called attention to those inconsistencies during its direct examination of officers who questioned Tucker, and in its opening and closing statements. Id. at 187. Tucker argued that "under established law, facts omitted from a statement are the same as the exercise of the right to remain silent, and therefore, the omissions are not admissible for any purpose." Id. at 188. We disagreed. Id. at 189.

We determined that the prosecutor's use of inconsistencies between a pretrial statement and the defendant's testimony -- the situation in Anderson -- is comparable to highlighting inconsistencies in several statements given prior to trial -- the situation in Tucker -- because there is "no meaningful distinction between the two situations that would justify a different result." Id. at 189-90. We also distinguished Tucker from Muhammad, in that the defendant in Tucker did not remain silent but freely related different stories to the police. Id. at 190. Thus, we held that "it is not an infringement of a defendant's right to remain silent for the State to point out differences in the defendant's testimony at trial and his or her statements that were freely given." Id. at 189.

IV.

A.

We must now apply state and federal precedent to the issue before the Court: whether defendant invoked his right to remain silent by refusing to answer certain questions posed by police; and, if so, whether the prosecutor improperly commented on defendant's silence by cross-examining him about details to which he testified on direct examination but omitted from his account given to police.

This Court has a strong tradition of protecting the right to remain silent. See, e.g., Deatore, supra, 70 N.J. at 115-17.

26

When a defendant invokes his or her right to remain silent, the interrogation must cease, at least until some time has lapsed and the defendant is reread his Miranda rights. Hartley, supra, 103 N.J. at 266-67; see also Mosley, supra, 423 U.S. at 104-105, 96 S. Ct. at 327, 46 L. Ed. 2d at 322. That being said, even if a defendant is successful in invoking his or her right to remain silent about a particular subject, this right is waived if the defendant discusses, of his or her own volition, that very topic just moments later. Miranda, supra, 384 U.S. at 478, 86 S. Ct. at 1630, 16 L. Ed. 2d at 726 ("Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence."); see also Bradley v. Meachum, 918 F.2d 338, 343 (2d Cir. 1990) ("[The defendant] cannot be said to have invoked his fifth amendment right regarding his willingness to discuss his involvement in the crime because, in the same breath, he denied any involvement."), cert. denied, 501 U.S. 1221, 111 S. Ct. 2835, 115 L. Ed. 2d 1004 (1991); United States v. Lorenzo, 570 F.2d 294, 298 (9th Cir. 1978) ("[I]n light of the willingness with which [the defendant] began to talk to the officers - and continued to do so after his failure to respond to a single question - he cannot be said to have invoked his right to remain silent.").

First, we hold that defendant waived his right to remain silent. Defendant was cognizant of his Miranda rights and

27

clearly and unambiguously invoked his right to counsel when police originally administered Miranda warnings and again at the end of the interview. However, after first invoking his right to counsel, it was defendant who asked to speak with officers so that he could "tell [them] the truth."

After acknowledging that he had fought with his brother, defendant avoided questions by saying "[a]h, let's not talk about that part," "we'll forget about that part," "it doesn't matter," and "I don't remember." By making those remarks at specific moments during the interrogation, defendant exhibited hesitation to provide police with some details about John's death. Nevertheless, considered in context, defendant's refusal to answer certain questions was not an attempt to end the dialogue, but rather was "part of an ongoing stream of speech," which included information about the altercation and defendant's family disputes. Meachum, supra, 918 F.2d at 342.

Defendant discussed his conflicts with his brothers, his concern that they would kill him, and the guns in Anna's house. Most importantly, defendant voluntarily provided details about the altercation that led to John's death -- the very subject about which he previously said, "let's not talk about that part." For example, defendant explained that John threatened to kill him when he got to Anna's house, that they "had a confrontation," and that his injuries resulted from John's

28

biting him.  In other words, defendant told investigators about his recollection of the altercation with John -- he thus spoke on that subject.

Because we find that defendant waived his right to remain silent, cross-examination regarding facts to which he testified at trial, but omitted in his statement to police, was proper. See United States v. Fambro, 526 F.3d 836, 842 (5th Cir.) ("A defendant cannot have it both ways.  If he talks, what he says or omits is to be judged on its merits or[] demerits, and not on some artificial standard that only the part that helps him can be later referred to." (quoting United States v. Goldman, 563 F.2d 501, 503 (1st Cir. 1977), cert. denied, 434 U.S. 1067, 98 S. Ct. 1245, 55 L. Ed. 2d 768 (1978))), cert. denied, 555 U.S. 1050, 129 S. Ct. 625, 172 L. Ed. 2d 617 (2008); United States v. Donnat, 311 F.3d 99, 104-05 (1st Cir. 2002) ("Where the defendant elects to speak to the police and gives statements that he later contradicts at trial, a prosecutor's inquiry into the defendant's failure to give the exculpatory account before trial does not draw a negative inference from defendant's decision to remain silent but rather from his prior inconsistent statement." (emphasis added)); Agnellino v. New Jersey, 493 F.2d 714, 730 (3d Cir. 1974) (Weis, J., concurring) ("A defendant who chooses to answer questions with half truths cannot claim constitutional protection to remain silent as to the other half.

29

A complete answer to a question may be as inconsistent with a partial reply as one completely different in detail." (emphasis added)).  If a defendant elects to speak to the police and offers an account of what happened, then he has not remained silent -- he has spoken.  Tucker, supra, 190 N.J. at 189 ("[I]t is not an infringement of a defendant's right to remain silent for the State to point out differences in the defendant's testimony at trial and his or her statements that were freely given." (emphasis added)); see Agnellino, supra, 493 F.2d at 730 (Weis, J., concurring).

During interrogation, defendant claimed his injuries were caused by John biting him.  Interrogators followed up by asking if "anything [was] used, other than [his] hands and [] fists," to which defendant responded, "No. no."  Defendant's story changed during his direct examination when he claimed John stabbed him in the arm with a screwdriver and he was forced to defend himself.  Therefore, the State's cross-examination sought to highlight the inconsistency between defendant's statement to police during interrogation and his testimony on direct examination at trial.  This inconsistency is a permissible area for cross-examination.

Finally, as a result of our conclusion that defendant did not invoke his right to remain silent, we find that any error in

30

the trial court's instruction to the jury, to which defendant did not object, was harmless.  R. 2:10-2.

## V.

For the reasons set forth above, the judgment of the Appellate Division is reversed, and defendant's conviction is reinstated.

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and TIMPONE join in JUSTICE SOLOMON's opinion.