**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2396-15T3

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

KELLI D. HENNESSEY,

     Defendant-Appellant.

_____

Argued September 12, 2018 – Decided September 26, 2018

Before Judges Messano and Rose.

On appeal from Superior Court of New Jersey, Law Division, Gloucester County, Indictment Nos. 07-10-1023 and 12-10-1034.

John Douard, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; John Douard, of counsel and on the brief).

Douglas B. Pagenkopf, Assistant Prosecutor, argued the cause for respondent (Charles A. Fiore, Gloucester County Prosecutor, attorney; Douglas B. Pagenkopf, of counsel and on the brief).

PER CURIAM

A jury convicted defendant Kelli D. Hennessey of second-degree assault by auto, N.J.S.A. 2C:12-1(c)(3)(a) (recklessly causing serious bodily injury while operating a vehicle in violation of N.J.S.A. 39:4-50 within 1000 feet of school property) (count one), and two counts of third-degree assault by auto, N.J.S.A. 2C:12-1(c)(3)(a) (recklessly causing bodily injury under the same circumstances) (counts two and three). On the same evidence, the judge found defendant guilty of driving while intoxicated (DWI) within 1000 feet of school property, N.J.S.A. 39:4-50(g)(1). The judge imposed a seven-year term of imprisonment on count one, concurrent four-year terms of imprisonment on counts two and three, and a consecutive sentence of 180 days in the county jail, plus additional mandatory penalties, on the motor vehicle violation.

Defendant raises the following points on appeal:

> POINT I
>
> AN EMPTY ALCOHOL CONTAINER FOUND IN MS. HENNESSEY'S CAR CONSTITUTED INADMISSIBLE PROPENSITY EVIDENCE, IN VIOLATION OF N.J.R.E. 404B. MOREOVER, NO LIMITING INSTRUCTION WAS PROVIDED WITH RESPECT TO THE EMPTY CONTAINER.

POINT II

OVER VEHEMENT OBJECTION, THE PROSECUTOR CROSS-EXAMINED DEFENDANT ON HER FAILURE TO TELL OFFICER JONES MR. LAWRENCE'S LAST NAME AFTER SHE WAS ARRESTED, AND HER REFUSAL TO TALK AFTER BEING ARRESTED, PREJUDICING DEFENDANT'S RIGHT TO A FAIR TRIAL. U.S. CONST. AMENDS V, XIV.

POINT III

THE JUDGE'S INSTRUCTION FOR THE JURORS TO CONTINUE DELIBERATIONS, AFTER THEIR REPRESENTATION THAT THEY WERE UNABLE TO REACH A UNANIMOUS VERDICT BUT WITHOUT FURTHER INQUIRY ABOUT THE DEADLOCK, DEPRIVED DEFENDANT OF THE RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL. U.S. CONST. AMEND XIV; N.J. CONST. (1947) ART. 1, PARS. 1, 9, 10.

POINT IV

THE TRIAL COURT ERRED BY NOT ISSUING A CLAWANS INSTRUCTION, AS REQUESTED BY DEFENSE COUNSEL, AFTER THE STATE FAILED TO CALL A CRUCIAL WITNESS, POLICE DETECTIVE MOAN, TO TESTIFY AT TRIAL.

POINT V

THE TRIAL WAS SO INFECTED WITH ERROR THAT EVEN IF EACH INDIVIDUAL ERROR DOES NOT REQUIRE REVERSAL, THE AGGREGATE OF THE ERRORS DENIED DEFENDANT A FAIR TRIAL. (Not Raised Below).

POINT VI

THE SEVEN-YEAR SENTENCE FOR THREE COUNTS OF ASSAULT BY AUTO, AND A CONSECUTIVE 180-DAY SENTENCE FOR DRIVING UNDER THE INFLUENCE IN A SCHOOL ZONE WAS MANIFESTLY EXCESSIVE.

Having considered these arguments in light of the record and applicable legal standards, we affirm.

I

We summarize some of the trial evidence to place defendant's arguments in some context.

In the early morning hours of November 6, 2011, Glassboro Police Officer Mindy Knight responded to the scene of a car accident near a local WaWa convenience store. She saw a woman, J.H.,[1] covered in blood and lying on the ground in the middle of the road. Two other women, R.S. and J.R., were sitting on a nearby curb. Knight saw a white Taurus near the scene with damage to its hood, a large hole in the passenger-side windshield and a side-view mirror stripped off.

---

[1] We use initials to maintain the confidentiality of the victims.

All three women were sorority sisters at nearby Rowan University and had walked from the school to buy some food at a restaurant near the WaWa. As they walked along the side of the road, a car struck them from the rear. J.H. was the most seriously injured, suffering a broken collarbone, tibia, fibula, facial lacerations and a permanent injury to her hip.

Emergency medical technicians and other police officers arrived at the scene, including Police Officer James Jones. Jones canvassed the area for witnesses, and saw defendant and one of the victims standing by the side of the road "hugging" and "crying." Both women said they did not see who was driving the car. Jones then located a New Jersey temporary registration tag in defendant's name in the Taurus. He also found a purse in the car with two driver's licenses in defendant's name.

As Jones spoke to other officers near the damaged car, defendant approached and admitted that she had been driving the vehicle. Defendant's eyes were bloodshot, her speech was slurred and Jones detected the odor of alcohol. Defendant confusedly claimed another car struck her car from behind and a third car might have been involved. Jones saw no evidence of damage to the rear of defendant's car, and no other vehicle at the scene. After defendant failed a series of field sobriety tests, Jones arrested her and transported her to

the police station. Defendant's blood alcohol content registered 0.13 on an Alcotest machine, well above the legal limit.

Defendant testified on her behalf and denied she was driving the car at the time of the accident, claiming a friend of her ex-husband, Robert "Robbie" Lawrence, was driving. Defendant admitted Lawrence was driving because she had been drinking. At some point in the evening, defendant called her ex-boyfriend and father of one of her children, Frankie Reim, and arranged to meet Reim at the WaWa to borrow some money. However, when Reim arrived, he and Lawrence began to argue and fight. Reim grabbed the keys to defendant's car, went inside the WaWa and gave the keys to a police officer in the store. According to defendant, the officer gave her a ride to the police station and another officer gave her a ride back to her ex-husband's home.

Her ex-husband and Lawrence drove to the police station to retrieve her keys and returned. She let Lawrence drive her home in her car. Defendant fell asleep, only to be awoken by a loud bang. Lawrence pulled the car over into a parking lot and ran off, leaving defendant, the injured women and the damaged car behind. Defendant admitted telling police her name and that she owned the car, but not that she was driving.

A-2396-15T3

Reim testified that he saw defendant earlier in the evening when she borrowed money from him. Defendant was intoxicated and with another man who was driving defendant's car. Defendant left after a short visit and called Reim a bit later, around 8:30 or 9 p.m., and asked if Reim could pick her up at the WaWa. Reim said he drove there with a friend and observed defendant and this other man drive into the parking lot and almost strike a pole. According to Reim, both defendant and the driver were "trashed." Reim saw a police officer inside the WaWa, and, after getting into an argument with defendant and the driver, took the keys to defendant's car and gave them to the officer, telling him neither defendant nor her male friend should be driving.

Sergeant Gordon Muller of the Franklin Township Police Department also testified on defendant's behalf. He acknowledged giving defendant rides in the past but could not recall if he gave her one on the evening of November 5-6, 2011.

II

We first deal with the alleged trial errors defendant raises in Points I, II, and IV.

Glassboro Police Detective Jack Manning, who was trained in accident investigation and reconstruction, testified that he visited the scene later in the

A-2396-15T3

morning and examined defendant's Taurus at the police impound lot where it had been towed. The detective found three plastic "Appletini"[2] containers, one in the rear of the passenger compartment on the driver's side, and two in a bag in the trunk.

Defendant objected as the detective started to identify the containers, contending the evidence was irrelevant because there was no proof that defendant had recently consumed what was in the containers. The prosecutor noted that defendant was charged with crimes and motor vehicle offenses, including having an open alcoholic beverage container in the vehicle, N.J.S.A. 39:4-51(b), which required proof of intoxication or proof the container was in the car. The judge overruled the objection.

At the end of its case, the State sought to introduce the containers into evidence. Defendant again objected, claiming there was no evidence that the containers actually contained alcohol. The judge agreed, ruling the detective provided "no clear indication that [the containers] did contain alcohol," and ruled them inadmissible.

---

[2] Detective Manning identified this as "an alcoholic beverage."

A-2396-15T3

Before us, defendant argues Manning's testimony was inadmissible "propensity evidence," in violation of N.J.R.E. 404(b), and even if it were admissible, the judge failed to give any limiting instruction. We disagree.

Despite Manning's testimony that the Appletini containers contained alcoholic beverages and that one of them at least had some residue in it when found, the judge seemingly accepted that the State had to elicit more explicit testimony from Manning, e.g., he smelled the odor of alcohol, or tested the contents. However, evidence is relevant if it has "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401 (emphasis added). A person's consumption of alcohol while driving is itself a separate offense. N.J.S.A. 39:4-51(a). We have said, "[o]pen alcohol containers in the vehicle would have a tendency in reason to prove recent alcohol consumption . . . ." State v. Irelan, 375 N.J. Super. 100, 117 (App. Div. 2005). In our minds, Manning's testimony was clearly sufficient to permit the jury to infer that defendant had recently consumed alcohol.

"The threshold determination under Rule 404(b) is whether the evidence relates to 'other crimes,' and thus is subject to continued analysis under Rule 404(b), or whether it is evidence intrinsic to the charged crime, and thus need only satisfy the evidence rules relating to relevancy, most importantly Rule

403." State v. Rose, 206 N.J. 141, 179 (2011). Evidence may be intrinsic to the charged crime in two ways. First, "evidence is intrinsic if it 'directly proves' the charged offense. . . . Second, 'uncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime.'" Id. at 180 (quoting United States v. Green, 617 F.3d 233, 249 (3d Cir. 2010)). Here, the evidence that defendant had Appletini containers in her car, including one in the rear, driver's side of the passenger compartment, led to the permissible inference that she had recently consumed alcohol and, therefore, was evidence intrinsic to the charged crimes and offenses.

Defendant testified that she told a police officer at the scene of the accident "Robbie was driving," but never provided his last name. According to defendant, the officer and she argued because he did not believe her. She "stopped talking" when it appeared she was going to be arrested. Defendant testified that back at the station, the officer asked her no further questions about who was driving nor did he seek further information about "Robbie." On direct examination, defense counsel asked:

> Q. Since the time that this event happened back in November of 2011, has anyone from the Glassboro Police Department come back to you to try to get you to talk to them about what happened?

A.	No.

Q.	Has any investigator from the County Prosecutor's Office ever contracted you to try to get information from you about the manner in which the [accident] happened or whether or not there was information you could provide about the person who was actually the driver?

A.	No.

On cross-examination, the prosecutor posed a series of questions, which we quote at length:

Q.	Now, when the police arrived, I guess you told them that, hey, he got away? He's fleeing the scene? I guess that's what you said first thing, right?

A.	I walked back over to my car, and that's when I saw the officer . . . .

Q.	And the first thing you said to him was, hey, Robbie Lawrence was driving my car, go get him. He just ran toward [a nearby business]?[3]

A.	That's not the first thing I said, no.

Q.	When did you say that?

A.	After I said my name, and that that was my vehicle.

---

[3] There is an obvious error in the transcript that conflates the prosecutor's next question with defendant's previous answer.

A-2396-15T3

Q.    And then you said to him, hey, Robbie Lawrence just went flying across the street?

A.    Well, I said . . . Robbie was driving.

       . . . .

Q.    And you gave the police an accurate description of what Robbie Lawrence looked like?
A.    They didn't ask.

Q.    And you didn't offer that?

A.    I didn't.

Q.    And you gave them  --  I guess you told them what kind of clothing he was wearing?

A.    They didn't ask, so  --

Q.    And you didn't tell them that, huh?

A.    No.

Q.    And you didn't tell them what kind of hair he had, what color it was, if he was bald, if he had a tattoo. . . .

A.    They didn't ask.

Q.    So you say, Robbie Lawrence was driving my car?

A.    I said Robbie was driving my car.

Q.    Oh, you didn't give them a last name?

A.    No.

    A-2396-15T3

. . . .

Q. And now, when you were doing the [field] sobriety test, I guess at that point you were really clear in saying, Patrolman Jones, I wasn't driving. It was Robert Lawrence.

A. Well, I told him . . . I wasn't driving, and he said he was going to put me under arrest so I didn't say anything else.

Q. So you didn't even tell him the name of the person who was driving at that point?

A. He didn't believe me.

Q. Because you said, several times. Robert Lawrence, Robert Lawrence, Robbie Lawrence.

A. I said Robbie, not Robbie Lawrence.

Q. So you never gave him the name of the person who was driving, correct?

A. Correct.

Q. So I guess by the time you got back to the police station and were getting ready to do that Breathalyzer test, correct, you had to blow several times into that machine. And there was that whole [twenty-]minute period that Patrolman Jones was just sitting there observing you, correct?

A. Yes.

. . . .

13

Q.   And you were the only person in the room with Patrolman Jones at that time. And in that [twenty] minutes, you said to him, Patrolman Jones . . . it was Robbie Lawrence?

A.   No, I didn't say anything.

Q.   So you didn't tell him then either?

A.   No.

Q.   Now, once you get the handcuffs on, and you've been bail set [sic], at that point you said it, right?

A.   I didn't say anything.

Defense counsel objected for the first time at this point. At sidebar, he asked for a curative instruction "that the jury cannot draw any negative inference from the fact that a defendant doesn't make a statement to a police officer." Although he reasoned there was "really nothing violative at this point," the judge decided to give the jury the following instructions:

> [I]t should be clear . . . to all of you that the defendant's silence on an issue can never be held against them in regard to guilty or innocence. In other words, because a defendant chooses not to talk to the police . . . or disclose certain things . . . cannot be used as guilt or innocence in your determination.
>
> . . . .
>
> . . . to the extent questions went to, why didn't you tell the police after you were under arrest and sitting there that there was somebody else driving, you

14

need not take that into consideration. What happened before that is appropriate. It's your credibility determination whether [defendant] disclosed it or not disclosed it and . . . whether her not saying it was somebody else[] is even evidence of her guilt.

When the prosecutor started to cross-examine defendant about whether she ever told her father or friends that Robbie Lawrence was driving at the time of the accident, the judge sustained defendant's objection and forbade that line of questioning.

In Point II, defendant argues the prosecutor's cross-examination about defendant's pre- and post-arrest failure to provide more information about "Robbie" violated her constitutional right to remain silent. The State contends that this was proper cross-examination designed to impeach defendant's testimony on direct examination, and the judge sustained defendant's objections when the questions ventured astray and provided an appropriate curative instruction. We find no basis to reverse.

It is axiomatic that the State may not "impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving Miranda[4] warnings at the time of his arrest." Doyle v. Ohio, 426 U.S. 610, 611 (1976). In State v. Muhammad,

---

[4] Miranda v. Arizona, 384 U.S. 436 (1966).

182 N.J. 551, 569 (2005), the Court held that "[o]ur state law privilege does not allow a prosecutor to use at trial a defendant's silence when that silence arises 'at or near' the time of arrest, during official interrogation, or while in police custody."

However, the Court has recognized that the prosecutor may highlight for the jury, through cross-examination or in summation, actual inconsistencies between pre-trial statements made to law enforcement and the defendant's trial testimony, State v. Tucker, 190 N.J. 183, 185 (2007), as well as trial testimony that is inconsistent with, or provides more information than, the defendant's prior statements to law enforcement after a waiver of rights. State v. Kucinski, 227 N.J. 603, 623-24 (2017).

Here, the prosecutor's cross-examination regarding defendant's statements to Officer Jones at the scene of the accident was proper. Id. at 621 (citing Tucker, 190 N.J. at 190). We agree that questions regarding defendant's post-arrest failure to provide further information were improper. Muhammad, 182 N.J. at 568. Under the peculiar facts of this case, however, the cross-examination does not require reversal.

In State v. Jenkins, 299 N.J. Super. 61, 65 (App. Div. 1997), the defendant gave an exculpatory version of events during his direct examination at trial,

claiming responding officers never gave him a chance to explain, even though he tried. He testified that after his arrest, no member of the police department ever spoke to him or took a statement from him. Id. at 66.

In summation, defense counsel argued that police never gave his client the opportunity to explain. Ibid. In his summation, the prosecutor argued that the defendant's testimony was incredible, because at no time after his arrest eight months earlier did he ever speak to the prosecutor's office or offer an exculpatory explanation for his conduct. Ibid.

We concluded that the prosecutor's comments "ordinarily would be improper." Id. at 68. However, in "explaining his post-arrest silence," the "defendant necessarily raised the issue . . . ." Ibid. As a result, "the prosecutor had a right, if not a duty, in the presentation of the State's case to comment on defendant's post-arrest silence and to offer the State's version as to why defendant was silent." Id. at 69.[5]

Here, defendant testified specifically about the failure on the part of police to question her further about "Robbie" after her arrest, implying police could have sought additional information but chose not to do so. In summation,

---

[5] We nevertheless reversed the defendant's conviction based upon other misconduct by the prosecutor. Id. at 69-71.

17                                                           A-2396-15T3

defense counsel told the jury that defendant's prosecution was the result of "sloppy police work."  In short, defendant "opened the door" with this line of questioning, id. at 68, and the limited questions the prosecutor posed prior to defendant's objection did not bring about an unjust result.  R. 2:10-2.  Moreover, although the judge's curative instruction was not the model of clarity, it served to limit whatever improper taint arose from this cross-examination.

In Point IV, defendant argues the judge erred by refusing to give an adverse inference charge pursuant to State v. Clawans, 38 N.J. 162, 170 (1962). The issue arose in the following context.

Before trial, in a written inquiry to the prosecutor, defendant sought the identity of officers other than Officer Jones who were at the scene, and which officers may have spoken to defendant at that time.  The prosecutor's paralegal responded with the name "Officer Moan."[6]  Moan was on the State's list of potential witnesses but was not called to testify.  During cross-examination, Jones said he spoke to Moan at the scene, but he never said Moan or any other officer was with him when defendant admitted she was driving.  Indeed, Jones said no one else heard defendant's admission.

---

[6]  The record does not disclose his first name, and at some points in the record the spelling is "Moen."

Defendant requested a <u>Clawans</u> charge at the conclusion of the evidence. In a comprehensive oral opinion, the judge denied the request but permitted defendant to comment during summation on the State's failure to call the officer. Defense counsel took advantage of this opportunity at length.

Defendant now argues the failure to give a <u>Clawans</u> charge was reversible error. We again disagree.

In <u>State v. Hill</u>, the Court explained a trial judge may provide an adverse inference charge after considering and making findings based on the following circumstances:

> (1) that the uncalled witness is peculiarly within the control or power of only the one party, or that there is a special relationship between the party and the witness or the party has superior knowledge of the identity of the witness or of the testimony the witness might be expected to give; (2) that the witness is available to that party both practically and physically; (3) that the testimony of the uncalled witness will elucidate relevant and critical facts in issue[;] and (4) that such testimony appears to be superior to that already utilized in respect to the fact to be proven.
>
> [199 N.J. 545, 561 (2009) (quoting <u>State v. Hickman</u>, 204 N.J. Super. 409, 414 (App. Div. 1985).]

An adverse inference charge is not "invariably available whenever a party does not call a witness who has knowledge of relevant facts." <u>Washington v. Perez</u>, 430 N.J. Super. 121, 128, (App. Div. 2013) (quoting <u>Hill</u>, 199 N.J. at 561). In

19

many cases the only rational inference to be drawn is the witness's testimony would not have been helpful to the trier of fact.  State v. Velasquez, 391 N.J. Super. 291, 308 (App. Div. 2007) (citation omitted).  Where the witness's testimony is unimportant, cumulative, or inferior to testimony already presented on the issue, it is reasonable to infer that non-production is explained by the fact that the testimony is unnecessary.  Id. at 308-09 (citing Clawans, 38 N.J. at 171).

The judge carefully considered the Hill factors, and we find no reason to disturb the well-reasoned exercise of his discretion in this regard.

III

After the court replayed Jones's testimony at the jury's request, the jurors deliberated for approximately an hour before sending a note to the judge asking, "What happens if it's not unanimous?"  After advising the attorneys, and without objection, the judge explained the verdict had to be unanimous and instructed the jurors to continue deliberations.  Shortly thereafter, the jurors requested playback of defendant's testimony.

After rehearing defendant's testimony at the start of the next trial day, the jury deliberated for less than thirty minutes and sent out a note that said, "[W]e are not unanimous and we believe there'll be no change to our decisions."  The judge excused the jurors for lunch, and then, without objection, read the model

jury charge again and told the jury to continue deliberating. Immediately thereafter and outside the presence of the jury, defense counsel noted "[his] position would have been that it's probably appropriate to [declare a mistrial and] excuse them." The judge responded, "I figured you're going to bring it up at some point but it wasn't time for that yet so I wasn't even considering it." It is unclear from the record how long the jury deliberated thereafter, but the jurors returned guilty verdicts later that day.

Defendant argues that "[u]nder the circumstances, before instructing the jurors to continue deliberations, the judge should have made further inquiry to determine if the jurors were indeed deadlocked or if further deliberations could be productive." Defendant submits the trial court should have given the model instruction approved by the Court in State v. Czachor, 82 N.J. 392 (1980). We disagree.

The "determination as to whether a Czachor charge is warranted" is left to the "sound discretion" of the trial court, and will be reversed only for an abuse of discretion. State v. Ross, 218 N.J. 130, 144 (2014) (quoting Czachor, 82 N.J. at 407). "[T]rial courts 'should be guided in the exercise of sound discretion by such factors as the length and complexity of trial and the quality and duration of the jury's deliberations.'" Ibid. (quoting Czachor, 82 N.J. at 407).

21

Here, there was six days of trial testimony, but, according to the court's estimate, the jury had deliberated only ninety minutes before sending out the second note, which indicated for the first time the possibility of a deadlock. Further, defense counsel never specifically requested that the judge give the Czachor charge. We find the argument entirely unpersuasive.[7]

IV

At sentencing, the judge found aggravating factors two, three, six and nine. N.J.S.A. 2C:44-1(a)(2) (the gravity and seriousness of the harm inflicted on the victim); (a)(3) (the risk of re-offense); (a)(6) (the extent of defendant's prior criminal record); and (a)(9) (the need to deter defendant and others). He considered all mitigating sentencing factors, and gave slight weight to factors six and eleven. N.J.S.A. 2C:44-1(b)(6) (defendant will compensate the victims, in this case, through restitution); and (b)(11) (imprisonment will work a hardship on defendant's family). The judge weighed these factors and imposed the sentences on the indictable offenses we referenced earlier. On the DWI

---

[7] It follows that none of the complained of errors cumulatively "rendered the trial unfair," as defendant contends in Point V of his brief. State v. Orecchio, 16 N.J. 125, 129 (1954); see also State v. Rambo, 401 N.J. Super. 506, 527 (App. Div. 2008) (noting that where an appellate court finds no errors at trial, a defendant's invocation of the cumulative error doctrine is to no avail).

A-2396-15T3

conviction, the judge noted, among other things, that this was defendant's fourth DWI conviction and imposed a consecutive 180-day sentence.

Before us, defendant argues the judge "double-counted" in finding aggravating factor two, because the serious harm suffered by one of the victims was inherent in second-degree assaults that cause "serious bodily injury." She also argues the judge inappropriately weighed the aggravating and mitigating factors, thereby rendering the seven-year term "excessive." We find no merit to these arguments. R. 2:11-3(e)(2). We add only the following.

The Legislature did not necessarily equate the harm contemplated in aggravating factor two with "serious bodily injury" as defined in N.J.S.A. 2C:11-1(b). State v. Kromphold, 162 N.J. 345, 358 (2000). In that regard, the Court in Kromphold explained aggravating factor two is "broader and less precise" than serious bodily injury. Ibid. The judge here did not find aggravating factor two by simply equating it with the serious bodily injury suffered by J.H.

"Appellate review of sentencing is deferential, and appellate courts are cautioned not to substitute their judgment for those of our sentencing courts." State v. Case, 220 N.J. 49, 65 (2014) (citing State v. Lawless, 214 N.J. 594, 606 (2013)). Generally, we only determine whether:

(1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."

[State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65, (1984)).]

We find no mistaken exercise of the judge's broad discretion in this case.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2396-15T3