690 A.2d 643

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
MANUEL JENKINS, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued February 11, 1997—Decided March 21, 1997.

Before Judges MICHELS and MUIR, Jr.

*Jacqueline E. Turner,* Assistant Deputy Public Defender, argued the cause for appellant (*Susan L. Reisner,* Public Defender, attorney; *Ms. Turner,* of counsel and on the letter brief).

*Steven J. Kaflowitz,* Acting Assistant County Prosecutor, argued the cause for respondent (*Edward M. Neafsey,* Acting Union County Prosecutor, attorney; *Mr. Kaflowitz,* of counsel and on the letter brief).

The opinion of the court was delivered by

MICHELS, P.J.A.D.

Tried by a jury, defendant Manuel Jenkins was convicted of attempted burglary, a crime of the third degree, in violation of *N.J.S.A.* 2C:5-1 and *N.J.S.A.* 2C:18-2. The trial court, based on the proofs before the jury, then convicted defendant of a related offense of possessing burglary tools, a disorderly persons offense, in violation of *N.J.S.A.* 2C:5-5. The trial court committed defendant to the custody of the Commissioner of the Department of Corrections (Commissioner) for five years with a two-year period of parole ineligibility, assessed a $50 Violent Crimes Compensation Board (VCCB) penalty and a $75 Safe Neighborhood Services Fund (SNSF) assessment for the attempted burglary conviction. In addition, the trial court committed defendant to the custody of

the Commissioner for a concurrent term of six months and assessed a $50 VCCB penalty and a $75 SNSF assessment for the possession of burglary tools conviction. Defendant appealed.

According to the State's proofs, at approximately 12:30 a.m. on August 26, 1994, Nuno Domingos, the owner of the Red Parrot Restaurant located on Broad Street in Elizabeth, New Jersey, was closing his establishment for the night. As he was turning off the lights in the upper level of the restaurant, Mr. Domingos heard a barmaid call to him from the downstairs area. Mr. Domingos went downstairs to investigate noise coming from the back kitchen door. The kitchen door from which the noise was emanating opens into a fenced-in, patio-like "beer garden" in the back of the restaurant used for dining, barbecues, parties, and other similar events. Mr. Domingos testified that he heard "a loud noise" coming from the door which sounded "like somebody hitting the door." He believed somebody was trying to break into the restaurant and immediately dialed "911." Mr. Domingos, who was afraid, then ran out of the front door of the restaurant and waited on Broad Street for the police to arrive.

Elizabeth police officers Alexandria Araujo and Jorge Hildalgo soon arrived and saw Mr. Domingos waving at them. Mr. Domingos then led the officers through the restaurant to the back kitchen door. As they opened the door, the officers saw a man, later identified as defendant, standing in the beer garden. Officer Araujo testified that when she entered the beer garden shouting "Police!", she noticed defendant raise his hands in the air and heard something fall to ground. Officer Araujo said that the something turned out to be a hammer. Officer Hidalgo also testified that when he entered the beer garden, he saw a hammer in defendant's hand, which defendant dropped when he put his hands up. The officers then placed defendant under arrest. While checking the area, the officers found pry marks on the side of the kitchen door facing the beer garden. The pry marks were fresh, as evidenced by the exposed wood on the door.

Defendant, on the other hand, denied that he had used the hammer in an attempt to pry open the door, and denied that he had intended to break into the restaurant to steal money or liquor. He testified that on the night in question, he had been in another bar, and when he left that tavern, an unidentified man followed and then chased him. At some point, he ran from the man, who was a half block behind, and entered the beer garden area of the Red Parrot Restaurant. To enter the beer garden, defendant scaled a six foot, barbed wire fence. When he reached the beer garden, defendant began banging on the back door with his hand to get help but was not heard. Defendant then found the hammer and began using it to bang on the door to get attention. Defendant testified that he "was in fear of [his] life," and stated that eventually the person who was chasing him also scaled the fence and entered the beer garden. Defendant noted, however, that when the police arrived, the other man fled.

At the conclusion of the proofs, the jury found defendant guilty of attempted burglary. The trial court then found defendant guilty of possession of burglary tools. Defendant appealed.

## I.

Defendant, for the first time on appeal, contends that the prosecutor's comments during summation on his (defendant's) post-arrest silence violated his Fifth Amendment rights as well as his rights under State common law, thus requiring a reversal of his convictions and a new trial. We disagree.

On direct examination, defendant, in response to his counsel's questions, testified as follows:

Q: Did either of the two officers that arrested you ever ask what your version of the story was?

A: No, it wasn't—no, sir, they didn't. I tried to explain it to them, but they just didn't want to hear what I had to say.

Q: What happened after you were cuffed?

A: They just put me in the police car and took me to the police headquarters.

. . . .

Q: Now, after you were arrested, where were you brought?

A: Brought to Elizabeth police station.

Q: And how long were you there?

A: I was there until four o'clock, until I was transferred to Union County Jail.

Q: Did there ever come a time that any member of the Elizabeth Police Department or a detective or anyone ever attempted to take a statement from you?

A: No, they did not.

Defendant's counsel also asked the following questions of Detective Kevin O'Leary, the Elizabeth police officer who conducted the follow-up investigation of the incident:

Q: Now, as part of your investigation follow[-]up into the crime, when a crime occurs, one of the things you can do is attempt to speak to someone in custody, correct?

A: Correct[.]

Q: In this case, you were unable to speak to Mr. Jenkins because he had been brought to the county jail; isn't that correct?

A: That's correct.

Defendant's counsel in summation made the following remarks:

[A] review of the evidence from the police officers and the detectives indicate that Mr. Jenkins was never allowed to provide an explanation as to why he was there at the scene. He was never asked by the police officers and he was never given an opportunity to provide a statement to the detective O'Leary at a future date.

The prosecutor then made the following comments in summation:

Do you think it's odd that a person who is arrested in the back dark secluded closed premises of a restaurant with a hammer in his hand eight months ago and the only reason he's there is because he is afraid, he's been chased, there's someone stalking him and startled all 200 pounds of him, all six feet of him. *He ... never once talks to the Prosecutor's Office. He never once tries to explain until he's here in front of you.* I don't believe it.

[Emphasis added.]

In *State v. Deatore,* 70 *N.J.* 100, 109, 358 *A.*2d 163 (1976), our Supreme Court announced that the State's cross-examination of a defendant concerning his/her post-arrest silence was improper. The *Deatore* Court explained that "[w]e reach that conclusion as a matter of state law and policy, as to which we may impose standards more strict than required by the federal Constitution, which standards will control regardless of the final outcome of the question in the federal sphere." *Id.* at 112, 358 *A.*2d 163 (citation omitted). The Court based its decision on principles of evidence

law and on the privilege against self-incrimination derived from New Jersey's common law. *Id.* at 113, 358 *A.*2d 163. With respect to the privilege against self-incrimination, the Court said the following:

> There can be no doubt that the right of an accused or a suspect to remain silent when in police custody or under interrogation has always been a fundamental aspect of the privilege in this state....
>
> The practical effect of the privilege to remain silent is, as we held a decade ago, "that when a defendant expressly refused to answer, no inference can be drawn against him under the doctrine of acquiescence by silence or any other concept," *State v. Ripa, supra,* 45 *N.J.* at 204, 212 *A.*2d 22, and no comment thereon may be made to the jury, *State v. Lanzo,* 44 *N.J.* 560, 563, 210 *A.*2d 613 (1965), following *Griffin v. California, supra*[, 380 *U.S.* 609, 85 *S.Ct.* 1229, 14 *L.Ed.*2d 106 (1965)]. This being so, it should certainly follow that a defendant is under no obligation to volunteer to the authorities at the first opportunity the exculpatory story he later tells at his trial and cannot be penalized directly or indirectly if he does not....

[*Id.* at 114–15, 358 *A.*2d 163.]

The Court in *Deatore* also noted that its holding applied to a defendant whether or not that defendant had received his/her *Miranda* warnings. *Id.* at 117 n. 10, 358 *A.*2d 163.

Later in 1976, the United States Supreme Court in *Doyle v. Ohio,* 426 *U.S.* 610, 619, 96 *S.Ct.* 2240, 2245, 49 *L.Ed.*2d 91, 98 (1976), held that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." The United States Supreme Court stated:

> Despite the importance of cross-examination, we have concluded that the *Miranda* decision compels rejection of the State's position. The warnings mandated by that case, as a prophylactic means of safeguarding Fifth Amendment rights require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation. Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial....

[*Id.* at 617–18, 96 *S.Ct.* at 2244–45, 49 *L.Ed.*2d at 97–98 (footnotes and citations omitted).]

An important distinction between the prohibition on the use of post-arrest silence set forth by our Court in *State v. Deatore, supra,* and the prohibition announced by the United States Supreme Court in *Doyle v. Ohio, supra,* is that New Jersey's rule applies to all post-arrest silence while the *Doyle* Court's holding was limited to post-arrest silence following a *Miranda* warning. *See Fletcher v. Weir,* 455 *U.S.* 603, 102 *S.Ct.* 1309, 71 *L.Ed.*2d 490 (1982) (permitting the prosecutor to impeach a defendant with the defendant's post-arrest silence when the defendant had not been given a *Miranda* warning). New Jersey courts have extended *Deatore* not only to a prosecutor's cross-examination impeachment of a defendant, but also to a prosecutor's use during summation of a defendant's post-arrest silence. *See, e.g., State v. Aceta,* 223 *N.J.Super.* 21, 28, 537 *A.*2d 1317 (App.Div.1988) (holding that a prosecutor's use of a defendant's post-arrest silence, which included comments on the silence during the prosecutor's closing argument, violated the defendant's right to remain silent). *See also State v. Lyle,* 73 *N.J.* 403, 409–11, 375 *A.*2d 629 (1977).

■ Thus, the prosecutor's comments in the present matter concerning defendant's post-arrest silence ordinarily would be improper. Here, however, defendant "opened the door," *see, e.g., McGautha v. California,* 402 *U.S.* 183, 213, 91 *S.Ct.* 1454, 1470, 28 *L. Ed.*2d 711, 730 (1971), to this otherwise protected area, justifying the prosecutor's comments on defendant's post-arrest silence.

On direct examination, defendant initially testified that he tried to explain to the police what happened but that they ignored him. Then defendant declared that after he was arrested, no police official asked him for his version of the events. Defendant was explaining his post-arrest silence, apparently attempting to show that his story was not the result of a recent fabrication. Yet, in doing so, defendant necessarily raised the issue of his post-arrest silence. Further, in his summation, defense counsel declared that defendant was never permitted to explain to the State what

occurred behind the Red Parrot. Again, these comments raised the issue of defendant's post-arrest silence.

In light of the foregoing testimony and summation, the prosecutor had a right, if not a duty, in the presentation of the State's case to comment on defendant's post-arrest silence and to offer the State's version as to why defendant was silent. In sum, the prosecutor's comments on summation concerning defendant's post-arrest silence did not constitute error, let alone plain error, requiring a reversal of defendant's convictions.

## II.

■ We agree, however, with defendant that the prosecutor exceeded the bounds of acceptable prosecutorial conduct by injecting her personal beliefs, during her summation, as to defendant's credibility. Although it is well settled that a prosecutor enjoys wide discretion during summation, we have on occasion expressed concern over the increasing frequency of prosecutorial excesses. *See, e.g., State v. Acker,* 265 *N.J.Super.* 351, 355, 627 *A.*2d 170 (App.Div.), *certif. denied,* 134 *N.J.* 485, 634 *A.*2d 530 (1993); *State v. Watson,* 224 *N.J.Super.* 354, 362–63, 540 *A.*2d 875 (App.Div.), *certif. denied,* 111 *N.J.* 620, 546 *A.*2d 537, *cert. denied,* 488 *U.S.* 983, 109 *S.Ct.* 535, 102 *L.Ed.*2d 566 (1988). In *State v. Goode,* 278 *N.J.Super.* 85, 91–92, 650 *A.*2d 393 (App.Div.1994), we emphasized that:

> Those entrusted with the responsibility of representing the State at criminal prosecutions must never forget their fundamental obligation is not to convict but to see that justice is done. *State v. Marshall,* 123 *N.J.* 1, 586 *A.*2d 85 (1991); *State v. Farrell,* 61 *N.J.* 99, 293 *A.*2d 176 (1972). If fairness and justice are forgotten in the pursuit of a guilty verdict, the integrity and authority of our criminal justice system is challenged.
>
> We have consistently recognized trials do not occur in a vacuum and a courtroom is not a classroom. Chief Justice Wilentz has noted "... rhetorical excesses ... invariably attend litigation." *State v. Williams,* 113 *N.J.* 393, 456, 550 *A.*2d 1172 (1988). Thus, prosecutors are afforded considerable leeway in their remarks to the jury. *State v. Purnell,* 126 *N.J.* 518, 540, 601 *A.*2d 175 (1992). This recognition, however, cannot obscure the fact that
>
>> '.... because the prosecutor represents the government and people of the State, it is reasonable to say that jurors have confidence that he will fairly fulfill

his duty to see that justice is done whether by conviction of the guilty or acquittal of the innocent.' *State v. Farrell,* 61 *N.J.* 99, 105 [293 *A.*2d 176] (1972). His comments during opening and closing carry the full authority of the State. *State v. Johnson,* 31 *N.J.* 489, 511 [158 *A.*2d 11] (1960). Hence, we cannot sit idly by and condone prosecutorial excesses.

[Quoting *State v. Spano,* 64 *N.J.* 566, 568, 319 *A.*2d 217 (1974) (alterations and omissions in original).]

Here, the prosecutor, during her summation, repeatedly expressed her personal opinion as to defendant's credibility. For example, she said of defendant: "I don't think he was credible, and I don't think you should buy his story because I don't buy it[;]" "I don't believe it[;]" "No, I don't buy it. I don't think you should buy it[;]" and "No, I don't think that's the sign of someone who's trying to get away from somebody. That's the sign of a thief. That's what I think." It is clearly improper for a prosecutor to give a jury his or her personal opinion regarding a case. *See, e.g., State v. Hinds,* 278 *N.J.Super.* 1, 18, 650 *A.*2d 350 (App.Div.1994), *rev'd on other grounds,* 143 *N.J.* 540, 674 *A.*2d 161 (1996). The reasons such opinions are improper are because the jury may view it as an invitation from the prosecutor to rely on him/her as a crime expert and because the jury may imply that the prosecutor's judgment is based on evidence not presented at trial. *Ibid.* (citations omitted). In addition, and building upon the first reason, the jury may adopt the prosecutor's view without applying its own independent judgment due, in part, to the prosecutor's "official and personal influence[.]" *State v. Thornton,* 38 *N.J.* 380, 398, 185 *A.*2d 9 (1962), *cert. denied,* 374 *U.S.* 816, 83 *S.Ct.* 1710, 10 *L. Ed* 2d 1039 (1963).

While a prosecutor has the right to call to the jury's attention discrepancies in a defendant's testimony and then argue that the defendant was not truthful, a prosecutor cannot express a personal opinion regarding the credibility of a defendant's testimony, as the prosecutor repeatedly did here. In our view, it was improper for the prosecutor to inject her personal opinions as to defendant's credibility in this matter, and the State concedes as much. However, the State argues that the prosecutor's remarks were harmless and did not prejudice defendant's right to a fair

trial. While such remarks may be harmless in other circumstances, the repetitive nature and the cumulative effect of the prosecutor's improper remarks here had a clear capacity to prejudice defendant's right to a fair trial. *See State v. Rose*, 112 *N.J.* 454, 523–24, 548 *A.*2d 1058 (1988); *State v. Orecchio*, 16 *N.J.* 125, 129–30, 106 *A.*2d 541 (1954); *State v. Acker, supra*, 265 *N.J.Super.* at 358, 627 *A.*2d 170. We, therefore, are constrained to reverse defendant's convictions and remand the matter for a new trial.

### III.

Since the matter must be retried, we deem it appropriate to caution the trial court that defendant's prior probation violation may not be used to impeach his credibility. The trial court here properly held, following a hearing pursuant to *State v. Sands*, 76 *N.J.* 127, 386 *A.*2d 378 (1978), and *State v. Brunson*, 132 *N.J.* 377, 625 *A.*2d 1085 (1993), that the State could impeach defendant's credibility with evidence of his prior convictions if defendant took the stand. The trial court explained that the State could either offer defendant's prior robbery conviction but not his burglary conviction and not sanitize the robbery conviction or offer both convictions and sanitize them pursuant to *State v. Brunson, supra*, 132 *N.J.* at 394, 625 *A.*2d 1085. The trial court further ruled that if the State chose the latter approach, it could elicit the indictment numbers of the offenses, the grades of the offenses, and the dates on which defendant was sentenced. Yet, the trial court, relying on *State v. Epps*, 259 *N.J.Super.* 266, 612 *A.*2d 391 (Law Div.1992), also held that the State could "get into the fact that the defendant was sent away to State prison and received a five-year term … after violating probation."[1]

When defendant took the stand he admitted in response to his counsel's questioning that he had been convicted of two prior crimes and had previously violated his probation. Thereafter, on

---

[1] The probation violation occurred while defendant was on probation for his prior burglary conviction.

cross-examination, the following exchange took place between the prosecutor and defendant:

Q:  Mr. Jenkins, on October 5th of 1984, you were sentenced to indeterminate to seven years on a second-degree offense; is that correct?

A:  Yes, I was.

Q:  And then on July 19th, 1991, you were given 364 days in the county jail, three years probation on a third-degree offense; is that correct?

A:  Yes, it is.

Q:  And subsequently about a year later, August 21st of '92, you were resentenced on a violation of probation to four years in state prison; is that correct?

A:  Yes, I was.

In summation, the prosecutor made the following comments:

Ladies and gentleman, this is the defendant who has had two past convictions. He shows that he has not abided by the law in this state and that he was sentenced on a violation of probation to four years in the state prison. Do you believe he would be credible when he puts his hand on the Bible and takes the oath and swears to tell the truth the same way a law abiding citizen would be—would? That's up for you to decide.

*N.J.R.E.* 609 sets forth the rule on impeaching a witness with a prior conviction:

For the purpose of affecting the credibility of any witness, the witness' conviction of a crime shall be admitted unless excluded by the judge as remote or for other causes. Such conviction may be proved by examination, production of the record thereof, or by other competent evidence.[2]

*N.J.R.E.* 609, which follows the provisions contained in *N.J.S.A.* 2A:81–12, as interpreted by *State v. Sands, supra,* applies only to criminal convictions. *Cf.* Biunno, *Current N.J. Rules of Evidence,* comment 1 on *N.J.R.E.* 609 (1996–97) (referring only to criminal convictions in explaining the purview of *N.J.R.E.* 609). This is abundantly clear, as appears from the following excerpt from the 1991 Supreme Court Rule Committee Comment:

---

[2] The New Jersey Code of Criminal Justice defines "prior conviction of a crime" in the following manner: "An adjudication by a court of competent jurisdiction that the defendant committed a crime constitutes a prior conviction, although sentence or the execution thereof was suspended, provided that the time to appeal has expired and that the defendant was not pardoned on the ground of innocence." *N.J.S.A.* 2C:44–4b.

While this rule draws no distinction between crimes of dishonesty or false statement and other crimes, it is clear that it applies only to indictable offenses which are the subject of valid convictions. Neither evidence of arrests for or charges of crimes are admissible under this rule. *See, e.g., State v. McBride,* 213 *N.J.Super.* 255, 267, 517 *A.2d* 152 (App.Div.1986). Neither are convictions of disorderly persons offenses or traffic violations. *See, e.g., State v. Rowe,* 57 *N.J.* 293, 302, 271 *A.2d* 897 (1970). Nor are adjudications of juvenile delinquency. *See State in Interest of K.P.* 167 *N.J.Super.* 290, 293–94, 400 *A.2d* 840 (App.Div.1979), *certif. denied,* 87 *N.J.* 394, 434 *A.2d* 1075 (1981). And, it has been held, uncounselled convictions are inadmissible. *State v. Rios,* 155 *N.J.Super.* 11, 15, 382 *A.2d* 82 (Law Div.197[7] ). *See also State v. Koch,* 119 *N.J.Super.* 184, 290 *A.2d* 738 (App.Div.1972).

A probation violation is distinguished from a criminal conviction even though a custodial sentence may result from such a violation. While a probation revocation proceeding is a step in the corrections process that involves a potential loss of liberty and requires due process, the probation violation itself does not constitute a criminal conviction. In *State v. Reyes,* 207 *N.J.Super.* 126, 134–37, 504 *A.2d* 43 (App.Div.), *certif. denied,* 103 *N.J.* 499, 511 *A.2d* 671 (1986), we recognized the differences between a criminal prosecution and a probation violation proceeding and noted:

Revocation of probation is not a stage in a criminal prosecution, but, rather, a part of the corrections process....

A violation-of-probation hearing is summary in nature. That was plainly expressed in the repealed *N.J.S.A.* 2A:168–4 and is implicit in the current *N.J.S.A.* 2C:45–3a(4). In both *Gagnon* [*v. Scarpelli* ] (involving probation), and *Morissey* [*v. Brewer]* (involving parole), the [United States] Supreme Court stressed the informal and flexible nature of revocation hearings and the lack of need or justification for the range of protections available to defendants in criminal trials.

New Jersey has not imposed stricter state constitutional standards on probation violation hearings than the United States Constitution demands.

. . . .

By what standard is a court to be "satisfied" that a violation occurred? Proof of violation beyond a reasonable doubt is not constitutionally required as it is in criminal trials....

... We hold, therefore, that a court may not find a violation of probation unless defendant has been convicted of another offense or the court is satisfied by a preponderance of the evidence that defendant has inexcusably failed to comply with a substantial requirement imposed as a condition of probation.

[Citations omitted.]

In *State v. Lavoy,* 259 *N.J.Super.* 594, 600, 614 *A.*2d 1077 (App.Div.1992), we again noted the differences between a criminal prosecution and a probation violation proceeding, explaining that

> [a] charge of a violation of probation is not a criminal prosecution but rather "a part of the corrections process." *State v. Reyes,* 207 *N.J.Super.* 126, 134, 504 *A.*2d 43 (App.Div.), *certif. denied,* 103 *N.J.* 499, 511 *A.*2d 671 (1986). Therefore, a defendant accused of violating the terms of probation is not entitled to indictment or trial by jury, *State v. Zachowski,* 53 *N.J.Super.* 431, 440, 147 *A.*2d 584 (App.Div.1959), and he may be found guilty by a simple preponderance of the evidence. *State v. Reyes, supra,* 207 *N.J.Super.* at 134–37, 504 *A.*2d 43. Furthermore, a violation of probation may be based on hearsay evidence which would be inadmissible in a criminal trial. *Id.* at 138–39, 504 *A.*2d 43.
>
> [*Id.* at 600, 614 *A.*2d 1077.]

Other courts have also determined that a probation violation is not equivalent to a prior conviction for impeachment purposes. For instance, in *Cross v. State,* 586 *S.W.*2d 478, 481 (Tex.Crim. App.1979), the Texas court determined that

> revocation of probation is not a conviction. . . . [P]robation revocation proceedings are not trials. Probation revocation proceedings are administrative in nature. A violation of probation conditions need be proved only by a preponderance of the evidence, not beyond a reasonable doubt (as is required for a conviction, a suspended sentence, or a judgment granting probation). Its value as proof of prior misconduct is correspondingly lower. Because of these differences, a probation revocation does not fall within the "conviction exception" to the general rule forbidding proof of prior acts of misconduct [to impeach.]
>
> [Citations omitted.]

*See also Favor v. State,* 389 *So.*2d 556, 559–60 (Ala.Crim.App.1980) (determining that "a probation violation is not a 'crime' of any kind," and was thus *per se* inadmissible to impeach a witness as a prior conviction); *State v. Anonymous (1978–1),* 34 *Conn.Supp.* 656, 384 *A.*2d 386, 389 (1978) ("A violation of probation is not a crime which could be introduced to impeach a witness."); *Commonwealth v. Roberts,* 423 *Mass.* 17, 666 *N.E.*2d 475, 478 (1996) ("Although convictions . . . may be used to impeach a witness's character for truthfulness, probation violations may not be so used."); *Commonwealth v. Ford,* 397 *Mass.* 298, 490 *N.E.*2d 1166, 1168 (1986) (holding that it was error to admit extraneous material, which included violations of probation, with records of a defendant's prior convictions to impeach him). *But see State v. Wil-*

*kins,* 34 *N.C.App.* 392, 238 *S.E.*2d 659, 663–64 (1977) (finding that it was not an abuse of discretion for a trial court to permit a witness to be cross-examined concerning the witness's prior probation violation).

■ Since a probation violation is not a criminal conviction, it cannot be used for impeachment purposes under *N.J.R.E.* 609. However, the ultimate sentence that a defendant may have received for a prior conviction as a result of a subsequent probation violation may be used to impeach the defendant under the rule. The admission of such sentencing information is particularly appropriate where, as here, the prior conviction has been sanitized pursuant to *State v. Brunson, supra,* 132 *N.J.* at 394, 625 *A.*2d 1085. *See State v. Hicks,* 283 *N.J.Super.* 301, 309–10, 661 *A.*2d 1300 (App.Div.1995), *certif. denied,* 143 *N.J.* 327, 670 *A.*2d 1068 (1996). Consequently, in the event that defendant testifies on retrial and his prior burglary conviction is used to impeach him, the trial court may, in its discretion, admit evidence of any sentence imposed upon defendant for his probation violation without reference to the violation itself. We disapprove of *State v. Epps, supra,* 259 *N.J.Super.* at 272–73, 612 *A.*2d 391, to the extent that it would also permit the probation violation or the facts underlying that violation to be used for impeachment purposes.

## *IV.*

Accordingly, defendant's convictions and the sentences imposed thereon are vacated and the matter is remanded for a new trial.