**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4076-15T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ANGEL CARLO,

    Defendant-Appellant.

_____

Argued October 24, 2017 — Decided August 1, 2018

Before Judges Leone and Mawla.

On appeal from Superior Court of New Jersey,
Law Division, Essex County, Indictment No. 15-
02-0342.

Margaret R. McLane, Assistant Deputy Public
Defender, argued the cause for appellant
(Joseph E. Krakora, Public Defender, attorney;
Margaret R. McLane, of counsel and on the
briefs).

Tiffany M. Russo, Special Deputy Attorney
General/Acting Assistant Prosecutor, argued
the cause for respondent (Robert D. Laurino,
Acting Essex County Prosecutor, attorney;
Tiffany M. Russo, of counsel and on the
brief).

PER CURIAM

Defendant Angel Carlo appeals from his April 25, 2016 judgment of conviction.  We affirm.

I.

At trial, the victim T.A. testified as follows.  On October 29, 2014, he encountered a man he frequently saw around his North Newark neighborhood over the past six or seven years.  He did not know the man's first or last name, but knew the man as "Rage."

Rage called out to him, and T.A. approached and greeted Rage. Rage responded in a hostile, intimidating, and offensive manner, with a raised voice and threatening body language.  That angered T.A. and the two began to fight.  After two to three minutes, he knocked Rage to the ground, and walked to his nearby home.

A few hours later, at around 8:45 p.m., T.A. left his house to go to a nearby fast-food restaurant.  One block from the restaurant, he again encountered Rage, who was standing near Broadway and Delevan, an area known as "D Block."  Rage acted calm and friendly towards T.A., but T.A. was scared Rage might have a gun because Rage had his hands in his pockets during the encounter. T.A. spoke for a few minutes to resolve their earlier conflict, and initiated a handshake.

T.A. started walking away.  When he was approximately twenty paces away, he heard a gunshot behind him.  He turned around and saw Rage was pointing a handgun at him.  T.A. started to run away.

He heard three more gunshots behind him. Two of the bullets hit him in the back of his right thigh and exited through the front of his leg, and the other grazed his calf.

T.A. made it to the restaurant and told a police officer he had been shot. T.A. was rushed to the hospital, bloody but alert.

Newark Detective Feliberto Padilla went to the scene, where four .380 caliber shell casings were found. A nearby restauranteur had heard four shots. No gun was recovered.

Detective Padilla went to the hospital and spoke to T.A., who said he was shot by Rage. T.A. described Rage as a short man with a pony tail wearing a gray hoodie with black markings who was from "D Block."

Detective Padilla testified that he used the information provided by T.A. to search social media using the word "Rage." Padilla found a video on YouTube that had been filmed in "D Block" and that featured a man who fit T.A.'s description of Rage and who was wearing a gray hoodie with black markings. From the video Padilla took a still, cropped photo showing that man.

A few hours later, when T.A. was released from the hospital, Detective Padilla took him to the police department and showed him the photo. T.A. identified the man in the photo as Rage and as the man who shot him.

Detective Padilla discovered the name of the man T.A. identified as Rage in the photo was Angel Carlo. Padilla obtained a clearer photo of defendant, drove to T.A.'s house, and showed that second photo to T.A. before dawn. T.A. identified defendant, the man in the second photo, as Rage and as the man who shot him.

On October 31, the police located and arrested defendant. He was wearing the same gray hoodie with the same black markings.

At trial, T.A. testified to these two identifications. He also made an in-court identification of defendant as Rage, saying he had no doubt defendant was the man who shot him.

Defendant testified he had seen T.A. in his neighborhood around Broadway and Delevan during the spring and summer of 2014, but did not know him. Defendant testified T.A. could not have seen him in earlier years because defendant was in prison. Defendant told the jury that he was convicted of a second-degree offense and a third-degree drug offense and sentenced to six years and three years respectively in State prison, and was incarcerated from July 18, 2005, to October 25, 2010. Defendant added that on May 9, 2011, he was imprisoned for three years and six months for a parole violation, and was not released until April 24, 2014.

Defendant denied encountering T.A., talking to him, fighting with him, shooting him, having a gun, or shooting a gun on October 29. Defendant also denied being at the scene when the shooting

4

occurred on October 29, even though he could not remember where he was. Defendant reasoned on cross-examination:

> Q. How do you know that you weren't on Broadway and Delevan on October 29, 2014?
>
> A. 'Cause I know I ain't shoot 'em.
>
> Q. I didn't ask that.
>
> A. You asked me how I know if I wasn't there. I can't be — if I didn't shoot him, I can't be there. So, I know I ain't do it, so I wasn't there.
>
> Q. Can you explain to me how the fact that you didn't shoot him means you couldn't have been in the area?
>
> A. I wasn't. Easy. I didn't shoot him.
>
> Q. All right. Do you know where you were on the evening of October 29th, 2014?
>
> A. No, I can't — can't recall.
>
> Q. So, you can't say where you were. Correct?
>
> A. No.
>
> Q. So the only place you can say something about is that you weren't on Broadway. That's —
>
> A. Yes, because I know I ain't shoot him. So, I can say that I wasn't in the area.

The jury convicted defendant of first-degree attempted murder, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3(a)(1); second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1); second-degree unlawful

possession of a handgun, N.J.S.A. 2C:39-5(b); and second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a). The trial court sentenced him to eighteen years in prison with an 85% period of parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2.

Defendant appeals, arguing:

> POINT I - THE PROSECUTION'S HIGHLY IMPROPER COMMENTS ON DEFENDANT'S POST-ARREST SILENCE, CROSS-EXAMINATION OF DEFENDANT ABOUT HIS NICKNAME, AND DEMANDS THAT DEFENDANT PRESENT AN ALIBI REQUIRE REVERSAL OF DEFENDANT'S CONVICTIONS. (Not Raised Below).
>
> A.   Introduction.
>
> B.   Right to Silence.
>
> C.   Flipping the Burden of Proof.
>
> D.   Improper Questions About Defendant's Nickname.
>
> E.   This Egregious Misconduct Requires Reversal of Defendant's Convictions.
>
> POINT II - WHEN THE DEFENSE WAS MISIDENTIFICATION, THE FAILURE TO INSTRUCT THE JURY ON HOW TO EVALUATE THE RELIABILITY OF THE PHOTO SHOW-UP IDENTIFICATIONS REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS. (Not Raised Below).

II.

On appeal, defendant challenges for the first time some prosecutorial questioning and argument. "Because he failed to object at trial, we review the challenged comments for plain

6                                                    A-4076-15T3

error." State v. Pressley, 232 N.J. 587, 593 (2018). We must hew to that standard of review.

Under the plain error standard, "defendant has the burden to show that there is an error, that the error is 'clear' or 'obvious,' and that the error has affected 'substantial rights.'" State v. Chew, 150 N.J. 30, 82 (1997) (quoting, and ruling "[o]ur law is the same" as, United States v. Olano, 507 U.S. 725, 734 (1993)). An error is not clear or obvious "unless the error is clear under current law" at the time of appellate consideration. Olano, 507 U.S. at 734; see Henderson v. United States, 568 U.S. 266, 279 (2013); Johnson v. United States, 520 U.S. 461, 468 (1997). To show an effect on substantial rights, defendant has the burden of proving the error was "clearly capable of producing an unjust result." R. 2:10-2. "To warrant reversal on appeal, the prosecutor's misconduct must be 'clearly and unmistakably improper' and 'so egregious' that it deprived defendant of the 'right to have a jury fairly evaluate the merits of his defense.'" Pressley, 232 N.J. at 593-94 (citation omitted).

"'Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial.'" State v. R.B., 183 N.J. 308, 333 (2005) (citation omitted). "[W]hen counsel does not make a timely objection at trial, it is a sign 'that defense counsel did not believe the remarks were prejudicial.'" Pressley,

232 N.J. at 593-94 (citation omitted). "Defendant's lack of objections . . . weighs against defendant's claim that errors were 'clear' or 'obvious.' Indeed, '[i]t [is] fair to infer from the failure to object below that in the context of the trial the error was actually of no moment.'" State v. Nelson, 173 N.J. 417, 471 (2002) (alterations in original) (citation omitted).

## A.

Defendant now claims that the prosecutor commented on post-arrest silence. The now-challenged comments addressed defendant's claim that he was not at the scene of the crime but was unable to remember where he was.

On direct examination, defendant denied being at Broadway and Delevan at around 8:45 p.m. on October 29, 2014. He testified he did not "have any idea where [he was]," "I don't remember. . . . I don't remember where I was."[1] He testified he did not learn he was charged with shooting T.A. until he was arraigned in March 2015.[2] Defendant implied, and later testified, that in March 2015

---

[1] Defendant added that he "was in the vicinity of North Newark," but clarified he said that just "[b]ecause [he] lived in North Newark."

[2] This was inconsistent with defendant's other testimony that he first heard T.A.'s name when he got arrested on October 31, 2014, and that his arrest was "the first time [he] even heard that there was a shooting on Broadway." It was also inconsistent with Officer Luis Santiago's testimony that defendant was aware he was being

it was "tough for [him] to remember where [he was] on October 29, 2014."

The prosecutor opened his cross-examination by asking:

> Q. Mr. Carlo, how would you characterize your memory?
>
> A. It's okay.
>
> Q. When was the first date you learned of the name [T.A.]?
>
> A. In March, when I got indicted.
>
> Q. Okay. And what happened on October 31st, 2014?
>
> A. I was arrested.
>
> Q. And what were you arrested for?
>
> A. Shooting [T.A.].
>
> Q. Did they tell you what you were arrested for?
>
> A. No.
>
> Q. So they refused to tell you any charges?
>
> A. Yes.
>
> Q. And they refused to tell you a victim?
>
> A. Yes.

Defendant then testified that he "asked the [two] officers" who "took [him] to the precinct," but they said: "You'll find out

---

"arrested for his involvement in a shooting" that occurred two days earlier.

when you get to the precinct." Defendant testified he "ask[ed] again" at the precinct, but no one would tell him. He testified that on November 1, 2014, he "kept asking, at the [county jail]," when he "ask[ed] the [corrections officer]," who told him "what the charges are." Defendant testified "they did not" tell him "where the incident allegedly occurred," or "what time it allegedly occurred."

Defendant's testimony prompted this exchange:

> Q. Did you ask?
>
> A. No.
>
> Q. You didn't want to know?
>
> A. No. I know I ain't do it.
>
> Q. But wouldn't it be important for you to know where you were allegedly at?
>
> A. If I asked a question, it's me — giving a reason. I'll ask my charge. Okay, now I know my charges. I got to go through a process. I still got to come to court.

Defendant now claims that exchange was a comment on silence. New Jersey "has a strong tradition of protecting the right to remain silent." State v. Kucinski, 227 N.J. 603, 622 (2017).

However, defendant did not remain silent. He admittedly asked the police officers, and "kept asking, at the County" jail. "If a defendant elects to speak to the police . . . , then he has not remained silent — he has spoken." Id. at 624 (citing State

v. Tucker, 190 N.J. 183, 189 (2007)). "As to the subject matter of his statements, the defendant has not remained silent at all." Tucker, 190 N.J. at 189 (quoting Anderson v. Charles, 447 U.S. 404, 408 (1980)). Regarding the subject of what he was being accused of doing, defendant was asking questions and thus was not silent.

Given defendant's testimony that he could not remember where he was when the crime occurred because the police officers he asked would not tell him when or where the crime was committed, the prosecutor could legitimately inquire if he asked for that information on November 1 from the helpful corrections officer who told defendant other information about the crime. Defendant admitted that he had not, and that on November 1, he would "have known where he was two days prior." The prosecutor could point out this inconsistency in defendant's questioning, which cast doubt on his claim that his alleged inability to remember where he was when the crime occurred was due to the refusal of authorities to tell him when and where the crime occurred.

"This inconsistency [wa]s a permissible area for cross-examination." Kucinski, 227 N.J. at 624; see Charles, 447 U.S. at 408-09. If a defendant is not silent but rather talks to police, the prosecutor can cross-examine about "inconsistencies in [his] several statements" to police. Tucker, 190 N.J. at 190.

11

"[W]hether the asserted inconsistencies by a defendant are between two or more statements or between a statement and testimony at trial, the State may seek to impeach the validity of those statements. In both instances, the defendant has not remained silent and therefore, any inconsistency may be challenged." Ibid. The prosecutor could likewise point out the inconsistencies in defendant's questioning of the officers.

Defendant cannot testify that officers would not tell him when or where the crime occurred, and then keep from the jury that he only asked the helpful corrections officer about the charges and not about where or when the crime occurred. "'A defendant cannot have it both ways. If he talks, what he says or omits is to be judged on its merits or demerits, and not on some artificial standard that only the part that helps him can be later referred to.'" United States v. Fambro, 526 F.3d 836, 842 (5th Cir. 2008) (citation omitted); see Kucinski, 227 N.J. at 623.

Defendant also now complains about this exchange:

> Q. And after November 1st, you stopped asking about where the alleged incident happened and things of that nature?
>
> A. Once I knew my charges, it was over. Now, I wait for court.

This exchange is problematic, because there was no evidence defendant spoke to any officer after November 1. However,

defendant opened the door to this exchange when he claimed no one told him when and where the crime occurred until his arraignment in March 2015. The "opening the door" doctrine "permits 'a party to elicit otherwise inadmissible evidence when the opposing party has made unfair prejudicial use of related evidence.'" State v. Prall, 231 N.J. 567, 582-83 (2018) (citation omitted). In State v. Jenkins, 299 N.J. Super. 61 (App. Div. 1997), the defendant claimed "he tried to explain to the police what happened but that they ignored him" on the day of arrest, and he was never given the opportunity to provide a statement later. Id. at 68. The prosecutor argued in closing that the defendant "never once talk[ed] to the Prosecutor's Office." Id. at 66. We held that "the prosecutor's comments in the present matter concerning defendant's post-arrest silence ordinarily would be improper," but the "defendant 'opened the door' to this otherwise protected area, justifying the prosecutor's comments on defendant's post-arrest silence." Id. at 68-69 (citing McGautha v. California, 402 U.S. 183, 213 (1971)); see State v. Morton, 155 N.J. 383, 418 (1998) (citing Jenkins).

In any event, this exchange was not prejudicial. It merely elicited what was implicit in the earlier exchange, namely that defendant stopped asking once he got the corrections officer to tell him his charges.

A-4076-15T3

The prosecutor also questioned whether defendant would have had to wait for his arraignment in court to find out where and when the crime occurred "if you simply asked," whether there was "a down side from asking," and whether defendant saw "any purpose in asking." Those questions did not ask whether defendant had remained silent. Rather, they asked why, a valid area of inquiry concerning his November 1 questioning of the corrections officer. Moreover, neither the questions nor the answers were prejudicial. Defendant merely reiterated that once "I know my charges," "I didn't see no point in asking" because "they're not gonna let me go" and "I still have to come to court."

Furthermore, the prosecutor's questions were not "'clearly and unmistakably improper.'" Pressley, 232 N.J. at 593-94 (citation omitted). Defendant cites cases where prosecutors commented on defendants' failure to tell the police exculpatory information, but this case involves defendant asking questions.

Defendant cites State v. Deatore, 70 N.J. 100 (1976), State v. Lyle, 73 N.J. 403 (1977), State v. Muhammad, 182 N.J. 551 (2005), and State v. Tilghman, 345 N.J. Super. 571 (App. Div. 2001). In Deatore, the prosecution on cross-examination asked defendant, "over objection, a series of questions bearing on his failure to make any exculpatory statement to the police after he was arrested." 70 N.J. at 104, 107, 115. In Lyle, the prosecution

14

on cross-examination and extensively in closing questioned why the defendant did not tell the police the exculpatory story he testified to at trial, namely that the victim had lunged at him with a screwdriver.  73 N.J. at 408-10.  In Muhammad, the prosecution in opening, questioning, and over objection at closing questioned why the "defendant did not give to the police the exculpatory account that his counsel provided to the jury."  182 N.J. at 562-63, 566, 572-73.  Tilghman likewise relied on the principle that "a defendant is under no obligation to volunteer to the authorities at the first opportunity the exculpatory story he later tells at his trial."  345 N.J. Super. at 574, 576 (quoting Deatore, 70 N.J. at 115).[3]

Those cases are plainly distinguishable, because here "defendant did not remain silent."  Tucker, 190 N.J. at 186, 190 (distinguishing Muhammad); see Kucinski, 227 N.J. at 618-21; State v. Marks, 201 N.J. Super. 514, 532 (App. Div. 1985).  Moreover, those cases prohibited prosecutors from commenting on the failure of the defendant to tell police an exculpatory story.  Defendant cites no cases making clear it is error to comment on defendant's

---

[3] Similarly, the seminal case about comment on silence, Doyle v. Ohio, 426 U.S. 610 (1976), involved a prosecutor trying "to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story . . . at the time of his arrest."  Id. at 611.

questions to the police.  We have found no such case.[4]  Thus,

defendant has failed to show any "error was clear under current

law."  <u>Henderson</u>, 568 U.S. at 270.

Defendant also now claims the prosecutor's closing argument

commented on his silence.  However, the prosecutor's argument was

that defendant's story "[d]oesn't make any sense" because of what

he said to the officers:

> First, he says to you that he asked two
> officers what was the basis of what he is being
> charged for.  And then, all of a sudden, washed
> his hands of it.  Didn't ask another one.  Let
> me ask you a question:  What is the first
> thing that anyone does when they're accused
> of doing something?  All right, what are you
> saying I did — what are you saying I did?  What
> are the charges that you're leveling at me?
> Because I want to know so that I can defend
> myself.
>
> Mr. Carlo says, yeah, I asked the two officers
> who drove me in the car, . . . and they said
> we'll tell you down at the station.  And I
> asked them again but when they didn't tell me,
> that was it.  I was done asking.
>
> He asked the CO later when he gets to [the
> county jail] and the [corrections officer]
> actually does look it up for him and tells him
> his charges.  Then Mr. Carlo doesn't ask him
> either.  He's got someone who's amenable to
> helping him out and he doesn't ask him, hey,
> where did they say that I had this gun?

---

[4] The only published case we found citing <u>Doyle</u> and involving a
defendant asking a question found error because the prosecutor
"comment[ed] on defendant's failure to offer his exculpatory
explanation at the time of his arrest."  <u>People v. Beller</u>, 386
N.E.2d 857, 858-62 (Ill. 1979).

The prosecutor's argument commented on the questions defendant asked, not on silence. As set forth above, the prosecutor was entitled to point out the inconsistency in defendant's pretrial questions to attack the credibility of his claim he could not remember where he was during the crime because the officers would not tell him where or when the crime occurred.

The part of the prosecutor's first paragraph beginning "Let me ask you a question" might have been improper if defendant had not spoken to the officers. However, it was not impermissible because defendant admittedly questioned the police officers and the corrections officer, and because the prosecutor was arguing the inconsistency in defendant's questions.

Moreover, the prosecutor's closing did not discuss the problematic issue of defendant's failure to ask questions after November 1. At the conclusion of the quoted argument, defense counsel objected on other grounds, but did not claim the prosecutor was commenting on silence. The trial court overruled those objections, but warned the prosecutor that he was "treading close to post [arrest] silence" if he commented on defendant's failure to ask subsequent questions: "You can't talk about his silence. You can talk about the conversation he had[.]" The prosecutor said "Okay" and turned to other topics in his closing.

Defendant has not shown that any error was "'so egregious' that it deprived defendant of the 'right to have a jury fairly evaluate the merits of his defense.'" Pressley, 232 N.J. at 593-94 (citations omitted).

B.

Defendant also argues that in the comments above and other comments, the prosecutor flipped the burden of proof, by implying defendant had the burden to present evidence. However, nothing in the comments discussed above said anything about defendant having to produce evidence at trial. The same is true about the other comments defendant cites.

Defendant cites this exchange during his cross-examination, which the prosecutor essentially quoted in his closing:

> Q. Did you ever ask your grandfather if he remembered where you were on October 29th, 2014?
>
> A. No, I haven't spoken to my grandfather since I been incarcerated.
>
> Q. Did you ever speak to your girlfriend about if she knew where you were on October 29th, 2014?
>
> A. I haven't spoke to her neither.
>
> . . . .
>
> Q. But you didn't reach out for your girlfriend at all?
>
> A. No.

Q.    Wasn't worth it?

A.    No.

. . . .

Q.    . . . And if you knew where you were and were able to present an alibi, that would increase your chances of not being convicted?

A.    Yes.

Q.    And let's clarify.  I'm not asking you to tell them where you were.  I'm asking you to ask them where you were.  Wouldn't that be useful for you to know?

A.    Yes. . . .

After quoting that exchange in his closing, the prosecutor argued: "He didn't call his girlfriend.  He didn't call his grandfather.  In fact, he said he did not even think about the incident."  The prosecutor then quoted a later exchange in defendant's cross-examination, after defendant agreed that "being charged with something I didn't do" and "sitting in the county [jail] for 17 months" had "been a nightmare."[5]

Q.    Did you spend time trying to remember where you were on the night of the charges?

A.    No.

Q.    You didn't give it any thought?

A.    Umm, no.

---

[5] Defense counsel had argued in opening that the period between defendant's arrest and trial had been "a 467 day nightmare."

Q. You didn't want to put an end to your nightmare?

The prosecutor then argued in closing to the jurors:

You guys are human beings. You guys have life experience, common sense. Does that make sense to you? Is that how you know human beings to act? . . . [W]hy wouldn't you take even the most elementary of efforts to see if you could put an end to that nightmare? Is that consistent with how human beings act? Or is that irrational? And unbelievable? Implausible?

Defendant did not object to the quoted portions of either the cross-examination or the closing. Thus, he must show plain error, and overcome the presumption he did not think the comments were prejudicial. Pressley, 232 N.J. at 593; R.B., 183 N.J. at 333.

The challenged statements were another effort by the prosecutor to counter defendant's testimony that he was not present at Broadway and Delevan when the crime occurred but could not remember where he was. The prosecutor's questions and arguments suggested that defendant could have jogged his memory of where he was by speaking with his grandfather with whom he was living, by speaking to his girlfriend, or by trying to remember where he was when the crime occurred. The prosecutor was contending defendant's admitted failure to do so showed his testimony that he was elsewhere when the crime occurred was "unbelievable" and "implausible."

20

Nothing in the prosecutor's questions or arguments suggested that defendant had a burden of proof, or that he had to call either his grandfather or girlfriend as witnesses. Rather, they were aimed at what the prosecutor told the jury the case was all about: "Credibility. One of the two people who took the stand lied to you. It's as plain as that. Your job is to figure out who was the person who lied to you?"

Defendant claims the prosecutor shifted the burden by later arguing to the jurors: "Have any of you ever been caught in a complete nightmare and taken no efforts whatsoever to put an end to that nightmare, despite it costing you nothing to do so?" However, the prosecutor then stated: "I suspect it hasn't because it doesn't happen in the real world. It doesn't happen in the real world because it's not truth and what that means is that you know who was lying." Again, the prosecutor made clear that he was challenging the credibility of defendant's testimony. Defendant cannot claim "the State impermissibly shifted the burden of proof to the defense" when the prosecutor was making a different point. See State v. Loftin, 146 N.J. 295, 389 (1996); State v. Zola, 112 N.J. 384, 427 (1988).

"Prosecutors can sum up cases with force and vigor, and are afforded considerable leeway so long as their comments are 'reasonably related to the scope of the evidence presented.'"

<u>Pressley</u>, 232 N.J. at 593 (quoting <u>State v. Timmendequas</u>, 161 N.J. 515, 587 (1999)). "A prosecutor may respond to defense claims, even if the response tends to undermine the defense case." <u>Nelson</u>, 173 N.J. at 473. It is "not improper for a prosecutor to comment on the credibility of a defendant's testimony." <u>State v. Darrian</u>, 255 N.J. Super. 435, 458 (App. Div. 1992); <u>see</u> <u>State v. Lazo</u>, 209 N.J. 9, 29 (2012). Also, "[i]t is not improper for the prosecution to suggest that the defense's presentation was imbalanced and incomplete." <u>Timmendequas</u>, 161 N.J. at 593.

Defendant argues this case resembles <u>State v. Jones</u>, 364 N.J. Super. 376 (App. Div. 2003). In <u>Jones</u>, the prosecutor asked the jury why the defense had not "dusted the gun for prints to disprove that his fingerprints were on there? Maybe the defendant knows something we don't, that it is his gun." <u>Id.</u> at 382. Defense counsel objected, the court refused to give a curative instruction, and we agreed that comment "unfairly suggested to the jury that he had a burden to introduce evidence." <u>Id.</u> at 381. Here, by contrast, the prosecutor did not suggest defendant had to perform tests or call witnesses, or "the possible results" if he had. <u>Cf. id.</u> at 383. Moreover, defendant did not object, making it "'fair to infer from the failure to object below that in the context of the trial the error was actually of no moment.'" <u>State v. Ingram</u>, 196 N.J. 23, 42 (2008) (quoting <u>Nelson</u>, 173 N.J. at 471).

22

In any event, any error in the prosecutor's statements was cured by the trial court's instructions. Loftin, 146 N.J. at 389. In its opening instructions, and in its final charge immediately after the prosecutor's summation, the trial court instructed the jury in essentially the same language: "The burden of proving each element of a charge beyond a reasonable doubt rests upon the State and that burden never shifts to the defendant. The defendant in a criminal case has no obligation or duty to prove his innocence, or offer any proof relating to his innocence." The court repeatedly reiterated that "[t]he State has the burden of proving the defendant guilty beyond a reasonable doubt."

"We presume the jury followed the court's instructions." State v. Smith, 212 N.J. 365, 409 (2012). Such instructions can be sufficient to cure even direct references to a defendant's failure to introduce evidence. State v. Patterson, 435 N.J. Super. 498, 505-06, 513-14 (App. Div. 2014) (ruling the instructions cured the prosecutor's comments that the defendant "could have produced some testimony" to support the defense position "but we don't have any"); State v. Munoz, 340 N.J. Super. 204, 215-17 (App. Div. 2001) (ruling the instructions cure a prosecutor's argument that the defense "haven't brought [the defendant] up" to the jurors so they could observe him closely); see also State v. Hill, 199 N.J. 545, 564-65, 569 n.9 (2009). Thus, defendant cannot

show the prosecutor's comments were "clearly capable of producing an unjust result[.]"  R. 2:10-2.

C.

Defendant concedes that his nickname "Rage" was properly admitted, but now contends the prosecutor improperly questioned him about it.  Defense counsel first questioned him about it on direct examination.  Defendant testified that almost "everybody" calls him Rage, and that Rage was his nickname in the neighborhood since he was fourteen when friends jokingly called him Rage as the opposite of Angel, his given name.

On cross-examination, the following exchange occurred:

> Q.   Is the opposite of angel rage?
>
> A.   Yes and no.
>
> .  .  .  .
>
> Q.   Is it just you who has this opposite nickname?
>
> A.   No.
>
> Q.   There's others who are nicknamed opposite for what their name is?
>
> A.   No.
>
> Q.   So it's just you?
>
> A.   No.  I'm saying -- I ain't gonna say they names is opposite of they names.  I can't say that.  A nickname is a nickname.  People give you nicknames.

24

Q. Sure. But yours is the one that's opposite?

A. That's what I was given to me, yes.

Q. Quasi opposite, because it's yes and no opposite of angel?

A. It was given to me because it's opposite of my name when I was young.

Defendant now complains the prosecutor "tried to show through cross-examination that Mr. Carlo must be lying about his nickname" by "pointing out that his nickname was not the exact opposite of his given name." We discern no clear purpose for this exchange.

Nonetheless, defendant cannot show plain error. The absence of an objection "'suggests that defense counsel did not believe the remarks were prejudicial.'" R.B., 183 N.J. at 333 (citation omitted). Nothing in the exchange was inflammatory. Most importantly, both before and after the exchange, the trial court instructed the jury it could not draw any adverse inference from defendant's nickname.

When defendant was first identified as Rage at trial, the trial court on its own initiative instructed the jury:

> Please keep in mind that a nickname alone does not constitute evidence of guilt or a propensity to commit crime. Many times, a nickname, in and of itself, may be interpreted to have different meanings. Regardless of the nickname associated to the defendant by this witness, you must disregard any inference as to the meaning behind the nickname. It may

25

only . . . be considered by you as a means of identifying an actual person, and for no other purpose, either during the trial or during your deliberations in this case.

Therefore, I instruct you that you must not use this evidence to decide that the defendant is a bad person, or has a tendency to commit crimes, simply because this may or may not be his nickname. That is, just because this witness may have known this defendant by a certain nickname cannot, and must not, lead you to conclude that the defendant must be guilty of the offenses charged here. You must not consider this evidence for that purpose.

Understand, also, as I have previously instructed you, a defendant is presumed innocent and that presumption stays with him until the State has proven guilt beyond a reasonable doubt, if that is the conclusion that you come to at the end of the case. You cannot utilize the fact that an individual is known by a certain nickname [t]o infer his guilt. Understood? Thank you.

The trial court essentially repeated the first and third paragraphs of that instruction in its final charge, and added:

Whether the defendant and that particular nickname are associated is for you to decide. The use of a nickname cannot, and should not, be considered by you for any other purpose, other than for possible identification of an individual mentioned during this trial. You cannot infer that based upon someone's nickname that he has any predisposition to commit a crime or otherwise perform any bad act.

"[T]he court's limiting instruction[s] to the jury regarding the use of [defendant's nickname] prevented any prejudice to the

26

defendant." State v. Paduani, 307 N.J. Super. 134, 146-47 (App. Div. 1998); see State v. Parker, 216 N.J. 408, 420 (2014) (requiring "'some tangible form of prejudice'" where the defendant objects to use of a false name). This exchange was innocuous, particularly in comparison to defendant's description of his criminal history to the jury. It was not "clearly capable of producing an unjust result." R. 2:10-2.

## III.

Lastly, defendant on appeal challenges for the first time the identification section of the trial court's final charge. However, when the court gave the parties opportunities to comment on the draft charge, defense counsel made only two comments unrelated to identification, and said she did not have anything else to add. Courts "review for plain error the trial court's obligation to sua sponte deliver a jury instruction when a defendant does not request it and fails to object at trial to its omission." State v. Alexander, 233 N.J. 132, 141-42 (2018). Moreover, "[d]efendant's failure to 'interpose a timely objection constitutes strong evidence that the error belatedly raised here was actually of no moment.'" State v. Tierney, 356 N.J. Super. 468, 481 (App. Div. 2003) (citation omitted). "[T]here is a presumption that the charge . . . was unlikely to prejudice the defendant's case." State v. Singleton, 211 N.J. 157, 182 (2012).

Defendant complains that in giving the pertinent portions of the Model Jury Charge (Criminal), "Identification: In-Court and Out-of-Court Identifications" (rev. July 19, 2012) [Model Charge], the trial court did not give the part addressing "a showup procedure." The State argues the showing of a single photo to a witness is not a showup.

"Showups are essentially single-person lineups: a single suspect is presented to a witness to make an identification. Showups often occur at the scene of a crime soon after its commission." State v. Henderson, 208 N.J. 208, 259 (2011). As that language suggests, showups have traditionally involved the witness seeing a single suspect live and in person. See id. at 261 (ruling officers "should instruct witnesses that the person they are about to view may or may not be the culprit"); State v. Herrera, 187 N.J. 493, 504 (2006) ("showups by definition are suggestive because the victim can only choose from one person, and, generally, that person is in police custody").

However, a decision issued after trial may suggest that showing a single photo to the witness is a showup. In Pressley, the defendant contended that showing a witness a single photograph "was essentially a showup." 232 N.J. at 590. The concurring justice agreed it was a "photographic showup." Id. at 595-98 (Albin, J., concurring). The Court found no basis for suppression:

"Although showups are inherently suggestive, 'the risk of misidentification is not heightened if a showup is conducted' within two hours of an event. Here, the identification took place within an hour." Id. at 592 (quoting Henderson, 208 N.J. at 259).

We assume without deciding that just as there are "live and photo lineups," that there can be live and "photo showup[s]." Henderson, 208 N.J. at 222, 251, 260, 277. We also assume the trial court should have given the portion of the Model Charge for "a showup procedure":

> In this case, the witness identified the defendant during a "showup," that is, the defendant was the only person shown to the witness at that time. Even though such a procedure is suggestive in nature, it is sometimes necessary for the police to conduct a "showup" or one-on-one identification procedure. Although the benefits of a fresh memory may balance the risk of undue suggestion, showups conducted more than two hours after an event present a heightened risk of misidentification. Also, police officers must instruct witnesses that the person they are about to view may or may not be the person who committed the crime and that they should not feel compelled to make an identification. In determining whether the identification is reliable or the result of an unduly suggestive procedure, you should consider how much time elapsed after the witness last saw the perpetrator, whether the appropriate instructions were given to the witness, and all other circumstances surrounding the showup.
>
> [Model Charge at 6-7.]

A-4076-15T3

Defendant claims that had the jury been properly instructed, it would have been able to consider the length of time between T.A.'s viewing of the shooter and the two photo show-ups, and the suggestive nature of showups. However, the trial court's identification instruction was broad enough to allow the jury to consider both factors.

The trial court instructed the jury to consider "the circumstances under which the identification was made." "In evaluating the reliability of the witness's identification, you should also consider the circumstances under which any out-of-court identification was made, and whether it was the result of a suggestive procedure. In that regard, you may consider everything that was done . . . by law enforcement . . . during the identification process." Finally, the court instructed the jurors that they were "also free to consider any other factor, based on the evidence . . . , that you consider relevant to your determination whether the identifications were reliable."

Thus, under the trial court's identification instruction, the jury was able to consider whether showing the witness a single photo was "a suggestive procedure." It is a "commonsense notion that one-on-one showups are inherently suggestive" and "by definition are suggestive because the victim can only choose from one person." Herrera, 187 N.J. at 504. The jury could draw that

commonsense conclusion from the obvious fact that the photos only displayed one person, defendant.

Moreover, the other factor making in-person showups suggestive was not present here. Defendant was not "in police custody" having just been arrested for the crime, but was a free man depicted in a still photo. Ibid. Further, the Model Charge's comment that a showup "is suggestive in nature" would have been offset by its comment that "the benefits of a fresh memory may balance the risk of undue suggestion." Model Charge at 7.

The trial court's instruction also allowed the jury to consider how much time elapsed after the witness last saw the perpetrator. Further, the court specifically instructed the jury: "Memories fade with time. As a result, delays between the commission of the crime and the time an identification is made can affect the reliability of the identification. In other words, the more time that passes, the greater the possibility that a witness's memory of a perpetrator will weaken."

Moreover, T.A. saw the still photo only about five hours after he last saw defendant. While "more than two hours after the event," Model Charge at 7, "an approximate five-hour period between the incident and the [showup] identification does not subvert the reliability of the identification procedure." Herrera, 187 N.J. at 509. T.A. saw the second, clearer photo only a few hours later.

Thus, "the times between the initial encounters and the later photo identifications were relatively short." State v. Adams, 194 N.J. 186, 205-06 (2008) (finding no "substantial likelihood of misidentification" where "the [photo showup] identifications were made within two days of the incident"); see id. at 192-93; id. at 210 (Albin, J., concurring).

Defendant also complains the trial court's identification instruction did not include the part of the Model Charge discussing multiple viewings. Id. at 6. However, that part is primarily intended to address the "risk of 'mugshot exposure' and 'mugshot commitment.'" Henderson, 208 N.J. at 255. "Mugshot exposure is when a witness initially views a set of photos and makes no identification, but then selects someone — who had been depicted in the earlier photos — at a later identification procedure." Ibid. "Mugshot commitment occurs when a witness identifies a photo that is then included in a later lineup procedure." Id. at 256. Neither risk was present here, as T.A. identified defendant's photo the first time he saw it, and the second procedure involved a different photo of defendant.

In any event, it is "significant" that T.A. was not identifying "'a stranger'" he had never seen before the incident. Herrera, 187 N.J. at 507. Rather, this resembled "a 'confirmatory' identification, which is not considered suggestive. A

32

confirmatory identification occurs when a witness identifies someone he or she knows from before but cannot identify by name. For example, the person may be a neighbor or someone known only by a street name." Pressley, 232 N.J. at 592-93 (citation omitted). T.A. knew defendant by sight for a substantial period, frequently saw him in their neighborhood, knew his street name, had talked and fought with him earlier that day, and had just spoken to him and shaken hands with him, but just did not know his birth name.

In addition, before seeing any photo, T.A. was able to accurately describe defendant and his gray hoodie with black markings. Defendant was still wearing it at the time of arrest, and was wearing it in the video. Finally, T.A.'s identification was unequivocal.

Under these circumstances, defendant cannot show prejudice from the omission of the showup and multiple-viewing parts in the trial court's identification instruction. See State v. Robinson, 165 N.J. 32, 46-47 (2000). The court's identification instruction otherwise contained all the pertinent portions of the Model Charge, including that "[t]he burden of proving the identity of the person who committed the crime is upon the State," and that "the State must prove beyond a reasonable doubt that this defendant is the person who committed the crime." Model Charge, at 1; see State

v. Cotto, 182 N.J. 316, 326-27 (2005); cf. State v. Sanchez-Medina, 231 N.J. 452, 468-49 (2018) (reversing where the court failed to give any instructions on identification). Defendant has failed to show the omission was "clearly capable of producing an unjust result." Alexander, 233 N.J. at 142 (quoting R. 2:10-2).

Defendant's remaining arguments lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION